## Case No. 15,321.

### UNITED STATES v. HASKELL et al.

[4 Wash. C. C. 402;[1] 2 Wheeler, Cr. Cas. 101.]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1823.

SEAMEN—REVOLT—RUNNING AWAY WITH VESSEL—FEAR AS EXCUSE—CONDUCT OF JURY—CHALLENGES—DISCHARGE.

1. To constitute the offence of running away with a vessel, it must appear that the command of the vessel must be taken from the captain by the accused, or without the consent of the captain, for some time, no matter how long, and that the act was done feloniously, and with the intent to convert the vessel and cargo to the use of the person or persons concerned in the act.

2. What constitutes a revolt?
[Cited in U. S. v. Kelly, Case No. 15,516.]

3. Fear, to excuse a person guilty of an alleged crime, must be fear of death. Such a fear as a man of ordinary courage and fortitude might yield to.

4. In a capital case, insanity of one of the jurors is a good cause for discharging the jury, without the consent of the prisoner or his counsel.
[Cited in U. S. v. Gibert, Case No. 15,204.]
[Cited in Com. v. McCormick, 130 Mass. 62; Com. v. Townsend, 5 Allen, 218. Cited in brief in State v. Dunn, 80 Mo. 682; State v. Ulrich (Mo. Sup.) 19 S. W. 658.]

5. Such discharge of the jury is in the discretion of the court, and it cannot form the subject of a plea in bar to the further trial of the prisoner.
[Cited in U. S. v. Gibert, Case No. 15,204; U. S. v. Morris, Id. 15,815.]
[Cited in Brown v. Swineford, 44 Wis. 287; Ellis v. State (Fla.) 6 South. 769. Cited in note to Lyons v. State, 1 Blackf. 311. Cited in brief in McCreary v. Com., 29 Pa. St. 324; McDonald v. State, 79 Wis. 653, 48 N. W. 864; State v. Nelson, 26 Ind. 368; State v. Reinhart (Or.) 38 Pac. 825.]

6. The meaning of the term "jeopardy," in the amendment of the constitution of the United States.
[Cited in U. S. v. Gibert, Case No. 15,204; Coleman v. Tennessee, 97 U. S. 520; Holmes v. Oregon & C. R. Co., 9 Fed. 239.]
[Cited in brief in Re Esmond, 5 Mackey, 66. Cited in Re McCluskey (Okl.) 37 Pac. 858; McDonald v. State, 79 Wis. 653, 48 N. W. 864; Price v. State, 36 Miss. 531; State v. Davis (W. Va.) 7 S. E. 26.]

7. The form of the oath to be administered to talismen, on the principal panel, when challenged for favor.

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

8. During a trial for a capital offence, the jury, after the adjournment from day to day, previous to the charge, may take refreshments; not afterwards.

This was an indictment [against Joseph Haskell and Charles Francois] containing four counts: First, for making a revolt; second, for piratically and feloniously running away with the vessel and goods, to the value of $50; third, for laying violent hands on the captain to hinder his fighting in defence of his vessel; and fourth, yielding up the vessel to a pirate. The material facts in the case were as follows: The Tatler, Nathaniel Garland, master, sailed from Baltimore on the 14th of March last, with a cargo to the value of about $5000, besides about $1600 in specie, and a crew consisting of the mate, Smith, the prisoners, and a black boy. On the night of the 17th, at sea, the captain went below to his berth, leaving Babcock, the mate, and Smith, one of the crew, the watch on deck. Soon after he had turned in, he heard a noise on deck, which caused him immediately to ascend to the companion way, where he found Babcock leaning, who informed him he was dying, and immediately fell dead on the deck. None of the crew were upon deck. Upon examining the helm, he found it fast; the sails all up, and the vessel on her course. He returned to the body of Babcock, and whilst he was stooping towards the body, he received two stabs, and turning himself about, he observed Smith close to him, who inflicted a severe wound on his neck, with a large knife which he held in his hand. He asked Smith what he was about? who answered, "I am killing you." He then seized Smith, and confined his arms; a scuffle ensued, and both fell on the deck by the side of each other. Whilst they were lying in this situation, the captain observed the knife on the deck between them, which he instantly secured, and threw overboard. Smith then extricated himself from the grasp of the captain, and got upon his feet. The captain also rose, went forward towards the forecastle, and called the hands on deck. The prisoners, and a black boy, soon afterwards made their appearance, when the captain stated to them that Smith had killed the mate, and stabbed him; and ordered them to assist him in seizing and securing the murderer; that they need not fear Smith, as he had taken his knife from him. Smith was at this time between him and the crew a short distance, and had no weapon in his hand: Instead of attempting to obey this order, Haskell went aft to the helm, and Francois disappeared, leaving Smith and the captain near to each other. The captain followed Haskell, and ordered him to clap the helm down, adding, "for we must seize this fellow, and get him out of the way." To this order, Haskell paid no regard. Smith then approached the captain with the bolt of the pump handle, and observed to him, in the presence of Haskell, who was at the helm, and near enough to be heard by him, "I have the command of this vessel; she is mine, and the men are under me." After some reproachful words addressed by the captain to Smith, the latter ordered the men to go forward, and take in the square-sail, at the same time threatening the captain to split his brains if he spoke another word to the men. Francois now made his appearance, and was observed by the captain to be forward, having hold of the haulyards of the square-sail. The captain immediately ordered Haskell (still at the helm) not to regard Smith, but to keep the sails up, and the vessel in her course. Smith then ordered the captain to go below, repeating the threat before denounced, if he did not. Finding that his orders were totally disregarded by the crew (for Haskell had gone forward to the square-sail), and that no hope remained that they would assist him against Smith, he determined to go below, and did so accordingly. After the captain got to the bottom of the steps, he determined to make one more desperate effort against Smith, and ordered Peter, the black boy, and his friend throughout, to bring him his gun. Having received it, he returned to the deck, and observed Smith and the prisoners engaged in getting in the square-sail, which was then partly in the water. They all, immediately, left the sail, and as they were coming aft to where the captain stood, and on the same side of the vessel, the captain discharged his gun at Smith, and within a few steps of him. The three men, without uttering a word, turned, and got on the other side of the vessel. The captain crossed the deck to meet them, with his gun clubbed. Haskell passed the captain, and went aft to the helm, leaving Smith and Francois standing near to each other. The captain then struck Smith on the head with the gun, which caused him to reel. He, nevertheless, caught hold of the butt of the gun, the captain retaining the other end in his grasp. A conflict now ensued between them, which terminated favourably for the captain, who succeeded in throwing Smith overboard. Both parties were much exhausted in this last conflict; the captain, by the loss of blood from his wounds, and Smith, by the contents of the gun, which he had received. After this victory obtained over Smith, the conduct of the prisoners towards the captain was unexceptionable. The captain was so much exhausted by the effusion of blood from his wounds, that he remained prostrate and helpless on the deck, until he was relieved by a pilot boat, which took the vessel into Lewistown, near the capes of Delaware.

The counsel for the prisoners contended: (1) That to constitute the crime of making a revolt, if indeed such a crime was susceptible of a definition, which they denied, it was essential to prove confederacy in the crew, which they insisted was not proved in this case. (2) That fear is an excuse in a case

of this kind, and even in treason, and that the prisoners were in that situation. Cases cited, 1 Chit. Cr. Law, 173; Mass. 251; U. S. v. Smith [unreported]; U. S. v. Sharp [Case No. 16,264]; U. S. v. Tully [Id. 16,545].

The district attorney replied: (1) That confederacy formed no part of any one of the offences charged in this indictment; and (2) That the fear which was urged as an excuse for the crimes alleged against the prisoners, must be a fear of death.

Mr. M'Ilvaine, for the prisoners.

WASHINGTON, Circuit Justice (charging jury). After summing up the evidence he proceeded: I shall make no observations upon the two last counts in this indictment, because, as to the third, the evidence is too feeble in my opinion to deserve observations respecting it. The captain merely stated on his examination, that whilst he was in the act of throwing Smith overboard, he felt the hand of some person on him, and that Francois was close to him. And as to the fourth count, it may admit at least of a doubt, whether the conduct of the crew did, in point of law, amount to a yielding up of the vessel to a pirate, notwithstanding Smith was clearly guilty of an act of piracy. As to the second count, which is for piratically and feloniously running away with the vessel, if you should be of opinion that the command of this vessel was taken from the captain and assumed by the mate, the prisoners consenting to it, and continued under this assumption for any length of time, however short, there was a running away with the vessel. But to constitute the offence, you must also be satisfied that the act was done feloniously, and with intent to convert the vessel and cargo, or either of them, to the use of the parties concerned in this business.

My observations will be confined principally to the first count, which is for making a revolt. What constitutes this offence is a question by no means settled in the courts of the United States. This court has decided that there is no legitimate or safe standard, by which to ascertain the definition of this offence, so highly penal in the punishment affixed to it. A learned judge of another court of the United States has given a definition of this offence. This court will now venture upon a definition, consistent with the one referred to, intending to obtain the opinion of the supreme court upon this important question, in case the prisoners should be convicted. If the definition which we shall give you should be condemned by the supreme court, the prisoners can sustain no injury in consequence of our error. The making a revolt then is, where the crew, or any part of them, throw off all obedience to the commander, and forcibly take possession of the vessel, by assuming and exercising the command and navigation

of her, or by transferring their obedience from the lawful commander to one who has usurped the command. If this be a correct definition of the offence, then it is unimportant whether the command be afterwards regained by the prowess of the lawful commander, or by foreign aid, or whether the possession of the vessel remained with the mutineers a day, an hour, or only a few minutes. You are then to say whether Captain Garland lost the command of this vessel for any length of time, no matter how short, and whether the prisoners aided therein, by throwing off all obedience to the master, and submitting to the usurped command of Smith, thereby transferring their duty and allegiance from the one to the other. The material facts relied upon to fix this offence upon them are the following: The murder of the mate, and the attempted assassination of the captain by Smith; the disregard by the prisoners of the captain's order to assist him in seizing and securing Smith; the open and avowed assumption of the command of the vessel, and of the crew, if not of the property in the vessel, in the presence of Haskell at least, followed immediately by his order to take in the square sail, promptly obeyed by both the prisoners, in defiance of Captain Garland's order to Haskell not to mind Smith, but to keep the sails up, and the vessel in her course; and finally, the forcible expulsion of the captain from the deck, and his necessary retreat and confinement below, until he was able to obtain the means of making one last struggle to regain possession of the deck, and to recover his command.

It is contended by the prisoners' counsel, that the design of dispossessing Captain Garland of his command, in favour of Smith, was not the result of a previously concerted plan between Smith and the prisoners, and that such a confederacy is an essential ingredient of the alleged offence. Whether there existed any such previous concert would be for you to decide, if the conclusion of the counsel were correct in point of law. But it is not so. Previous confederacy forms no part of the offence. It forms no part of another offence, which this most nearly resembles. For if a band of traitors should order the inhabitants of a particular district to join them, and they should voluntarily obey the order, they would be guilty of treason, although they had nothing to do with the original conspiracy against the government. So here, if the prisoners were total strangers to Smith's designs, until the moment when they were displayed by overt acts against the captain, and they afterwards joined with him in subverting the command and authority of the legitimate commander, their former ignorance of his intentions cannot excuse them.

It is in the next place urged in excuse of the prisoners, that they acted throughout

this transaction under the impulse of fear. But the fear which could alone excuse them must be fear of death; such a fear as a man of ordinary fortitude and courage might justly yield to. Were these men in this situation? Was Smith, without a weapon of any kind in his hand when the order to assist the captain in seizing him was given, and armed only with a pump bolt six or seven inches long when he assumed the command and issued his order which was obeyed, so much an overmatch for the captain (who, though stabbed, yet courageously maintained his ground), the two prisoners and the black boy (the steady friend of the captain), as justly to excite in the prisoners a fear of death, if they should venture to disobey his order? But as a test of the sincerity of the alleged apprehensions of the prisoners, ought they not, before they yielded to them, to have refused to acknowledge the usurped command of Smith, and have waited until, by some act of Smith, a well grounded cause of fear was excited? Had they done so, is it, or is it not probable, that finding himself alone, and in a state of hostility with every person on board, Smith would have submitted, and returned to his duty? But the prisoners, without waiting for some act of Smith's to excuse their fears, had not received, from the beginning to the end of this melancholy drama, even a menace from Smith to cause them. You are therefore to say whether, upon the evidence, the prisoners had a well grounded cause to fear that death might be the consequence of their refusal to submit to Smith as the commander of the vessel. If they had not, they cannot excuse themselves in point of law by the allegation that they acted under the impulse of fear.

The jury returned twice to the bar, and being asked if they had agreed upon a verdict, answered by their foreman, that they found the prisoners guilty upon the first count, and not guilty upon the other counts. But upon being polled, one juryman, after much apparent agitation, and declaring that he was not quite collected, answered, "Not guilty." The court being satisfied, not only from the appearance and conduct of this juryman, but from the declarations of many of the jurymen as to the conduct and speeches of this person that he was insane, and totally unfit to act as a juryman, caused the following entry to be made on the minutes: "The jury having been kept together three days, and more than twenty-four hours without refreshments, and there being no prospect of their agreeing, and the court being satisfied of the insanity of one of the jurymen, discharges the jury without the consent of the counsel for the prisoners?" [2] The jury was accordingly dischar-

ged, and upon the panel being called over, at another day, for the trial of the prisoners, the counsel for the prisoners tendered to the court a special plea, stating the arraignment of the prisoners, the trial, and the other circumstances of the declarations of the jury, "that they could not agree," and the discharge of the jury by the court, without the consent of the prisoners or their counsel, and concluding that the said discharge was equivalent to an acquittal, and praying judgment of the court if they ought again to be put on their trial, and in jeopardy of their lives. The district attorney immediately demurred generally to the plea. He contended (1) that the matter of this plea is not a fit subject for a plea; and (2) that the discharge of the jury in this, as well as in all other cases of necessity, rests in the sound discretion of the court, and this discretion was soundly exercised in this case. Both these points were controverted by the prisoners' counsel, who cited the following cases: Com. v. Cook, 6 Serg. & R. 578; 2 Hale, P. C. 294. Hawk. P. C. bk. 2, c. 47; 3 Inst. 110; 1 And. 103, 104: fifth amendment to the constitution of the United States; Fost. Crown Law. 23; 2 Johns. Cas. 301; 1 Chit. Pl. 639, 169, 70, 644, as to demurrer.

WASHINGTON, Circuit Justice, delivered the opinion of the court.

The first, and the most important question which arises upon these pleadings is, is the subject matter of this plea properly pleadable in bar of a second trial of the prisoners? The importance of this point arises from the following considerations: The plea avoids stating the recorded reasons of the court for discharging the jury, and places the discharge on the single ground that the jury declared they could not agree. The district attorney had no other course to pursue, in order to bring the true case before the court, but to reply to the fact of the insanity, or the recorded reasons of the court for discharging the jury. In either case the rejoinder, by traversing the facts stated in the replication, would necessarily have submitted the truth of the facts, as well as the legality of the discharge, to the decision of a jury. To avoid so extraordinary a trial, the district attorney could do no otherwise than demur, and thus present the question which I have now to examine. Whatever name may be given to this plea, one thing is clear, that it is not a plea of autrefois acquit; nor could the counsel have ventured such a plea, because it must have stated a verdict of acquittal and the judgment of the court thereon: which the record, to which the plea must have referred, upon the replication of nul tiel record would have falsified. The plea indeed does not profess to be a plea of autrefois acquit, for it merely alleges the discharge of the jury as equivalent in law to an acquittal.

[2] See U. S. v. Perez, 9 Wheat. [22 U. S.] 579, which fully sanctions this order, and the opinion founded on it.

I shall examine this question under the following heads: First, is there a single precedent to be found to support this plea? Second, can it be supported upon principle? or thirdly, on authority of any kind?

I have met with but one precedent for this plea, and that is to be found in the case of Com. v. Cook, 6 Serg. & R. 577, from which it is probable this plea was copied. But it is to be remarked, that in that case, the plea set forth truly the whole ground upon which the jury was discharged, as recorded by the court. The prosecutor had nothing to do but to demur generally to the plea, and in this way to bring forward the question, whether the court is authorised to discharge the jury against the consent of the prisoner's counsel, upon the single ground that the jury, after remaining in their room for a certain length of time, declared that they could not, and never should agree. The question, therefore, as to the validity of the plea, did not and could not arise, nor was it once mooted, or even alluded to at the bar, or by the bench. It is further to be remarked, that in that case, the court directed the prisoner's counsel to connect with the plea a motion to discharge the prisoner. This, therefore, though giving us a precedent for such a plea, is not a precedent to support it as a valid plea. In the case of People v. Goodwin, 18 Johns. 187, the propriety of the discharge of the jury, came before the court upon a motion to discharge the prisoner. In People v. Olcot, 2 Johns. Cas. 301, the same course was pursued. In the case of Rex v. Edwards, 4 Taunt. 309, the question came before the court of exchequer, upon a point reserved by the judge at the assizes. In U. S. v. Coolidge [Case No. 14,858], the court merely gave an opinion on the subject of discharging the jury; no plea was put in in that case. In Com. v. Bowden, 9 Mass. 494, the question was discussed on a motion in arrest of judgment, and so it was in the case of Kinloch [Fost. Crown Law, 16], and in that of People v. Barrett, 1 Johns. 66. In the case of People v. Denton, 2 Johns. Cas. 275, the prisoner, on his second trial, being called upon to plead, his counsel mentioned the discharge of the jury on the first trial, and moved the court not to compel the prisoner to plead, but to discharge him. The court compelled the prisoner to plead, and he plead "Not guilty." These are all the cases. This plea then is a novelty in the law, and that circumstance of itself is a persuasive argument against its validity.

2. Is this plea to be supported in reason, and on principle? We think it is not, because we consider the authority of the court to discharge the jury, to rest in the sound discretion of the court. It can rest no where else. It is merely an incidental matter arising in the progress of the trial, in no way connected with the question before the jury, of guilty or not guilty. It is an incidental matter depending upon circumstances appearing to the satisfaction of the court, as requiring them,

in the proper administration of justice, to discharge the jury. It is surely as much a matter of discretion, as the granting a new trial after a verdict is rendered. This is so much a matter of discretion, that the supreme court of the United States will not permit the judgment of the inferior court, in granting or refusing to grant a new trial, to be reexamined upon a writ of error. Now suppose, after a verdict of acquittal, the court should grant a new trial, upon satisfactory proof that the verdict had been obtained by the fraud of the prisoner. Would it be endured, that upon a second arraignment of the prisoner, he should plead the granting of the new trial, put in issue the fact of the fraud to be submitted to the jury, as well as the question whether the court exercised their discretion soundly in granting a new trial? Certainly it could not, and yet that is a stronger case than the present, because in that the prisoner had been acquitted by the jury. Would it be permitted to a jury to revise and correct the judgment of the court as to fact and law (for in criminal cases, they have the uncontrolled power to decide both in favour of the accused), when even a superior court refuses to exercise such a power? We think not. But let us follow out this subject to its consequences, for the purpose of testing its correctness. Suppose the ground of discharging the jury were the intoxication of the juryman so as to unfit him to perform his duty; one of the jurymen falling down in a fit; or the apparent exhaustion of the jurors to a certain degree, or one of them, from the want of refreshments: all which, and many more, are admitted, even in Cook's Case, to be justifiable grounds for discharging the jury, and this matter is put in issue by the prisoner's counsel compelling the prosecutor to reply, as has been attempted in this case. The question before the jury would be, whether the court exercised a sound discretion in discharging the jury, upon proof being laid before them that the juror, although intoxicated, was yet not so far gone as to be incapable of discharging his duty; that the man, though he had a fit, yet he recovered within a few minutes after the discharge; or that the exhausted jurymen were able to have continued their deliberations for a much longer time. How unsafe, how unsatisfactory would be such a course of proceeding? How absurd, how inconsistent with general principles of law, that the jury should thus sit in judgment upon the opinion of the court, to condemn it, and upon this collateral matter, to acquit the prisoner, without deciding the question of guilty or not guilty? We are then of opinion, that the practice attempted to be introduced in this case is repugnant to reason and to law.

3. Can this plea be maintained upon authority? So far from it, we believe that every case relating to this subject repudiates the plea, because they all consider the authority of the court to discharge the jury, as resting in the sound discretion of the court. In the

Doctor and Student. an ancient book, but of high authority, this is expressly stated. It is asserted and maintained in all the New York cases before referred to, and is sanctioned, as we think, by the supreme court of this state in Cook's Case. For the chief justice, after passing, what I firmly believe to be a merited eulogium upon the virtue and integrity of the state and United States judiciaries, and expressing his satisfaction that the question came on now to be decided, adds, "that other times may come when other judges might abuse their discretion." In page 587. he says "that the moment it is made to appear to the court by satisfactory evidence, that the health of a single juryman is so affected as to incapacitate him to do his duty, a case of necessity has arisen, which authorises the court to discharge the jury." The authority then exists when the court is satisfied of the fact; which can only mean, that this authority rests in the sound discretion of the court. But it is contended, that although the court may discharge in cases of misdemeanour, they have no such authority in capital cases; and the fifth amendment to the constitution of the United States is relied upon as justifying the distinction. We think otherwise; because we are clearly of opinion, that the jeopardy spoken of in this article can be interpreted to mean nothing short of the acquittal or conviction of the prisoner, and the judgment of the court thereupon. This was the meaning affixed to the expression by the common law, notwithstanding some loose expressions to be found in some elementary treatises, or in the opinions of some judges, which would seem to intimate a different opinion. Upon this subject we concur in the opinion expressed by the supreme court of New York in Goodwin's Case, although the opinion of the supreme court of this state in Cook's Case is otherwise. We are in short of opinion, that the moment it is admitted that in cases of necessity the court is authorised to discharge the jury, the whole argument for applying this article of the constitution to a discharge of the jury before conviction and judgment is abandoned, because the exception of necessity is not to be found in any part of the constitution; and I should consider this court as stepping beyond its duty in interpolating it into that instrument, if the article of the constitution is applicable to a case of this kind. We admit the exception, but we do it because that article does not apply to a jeopardy short of conviction. If we are correct in this view of the subject. then there can be no difference between misdemeanours and capital cases, in respect to the discretion possessed by the court to discharge the jury in cases of necessity; and indeed, the reasoning before urged in relation to a plea of this kind. if sound, is equally applicable to capital cases as to misdemeanours. By reprobating this plea, we do not deny to a prisoner the opportunity to avail himself of the improper discharge of the jury as equivalent to an ac-

quittal, since he may have all the benefit of the error, if committed, by a motion for his discharge, or upon a motion in arrest of judgment.

It was asked by the prisoners' counsel: Will the court decide this question without either permitting a jury to examine into the truth of the facts which induced the court to discharge the jury, or without examining into it themselves? We answer, Yes. When the court, being satisfied that there was good ground for directing the discharge, had ordered the reasons for this direction to be entered on the minutes, the prisoners' counsel might have requested the court to examine more particularly into the alleged insanity of the juryman, and to hear evidence on that subject. But after the record made of the grounds of the discharge, and the actual discharge, it is too late to question the verity of the facts which satisfied the court. Was it ever heard of, that evidence was received on a motion in arrest of judgment? The only question on that motion, or on a motion to discharge, would be, whether the reasons assigned by the court did, or did not, authorize the discharge? As to the question, whether the court was authorized to discharge the jury on account of the insanity of one of the jurymen, we entertain no doubt. We entirely concur in the opinion of the supreme court of this state in Cook's Case, that the court ought not to discharge the jury merely upon the ground that the jury say they cannot agree, however positive the declaration may be. But that they are fully authorised to discharge in cases of necessity, and that, whether the offence be capital or a mere misdemeanour; as if the jury are so exhausted as not to be able to continue their deliberations; where the prisoner has tampered with some of the jury, or has contrived to keep back the witnesses for the prosecution; if the prisoner, on her trial, becomes insane, is taken in labour, &c.; where one of the jurymen falls down in a fit, and is unable to proceed on his duty. or is found to be insane; if a juryman, after the jury had left the bar. went out of town; intoxication of one of the jurors. rendering him incapable of performing his duty. Other cases of necessity to authorise a discharge of the jury might be mentioned, but it is deemed unnecessary. The plea must be overruled.

NOTE. Another jury being called, the court, upon application of the counsel for the prisoners, decided, that they might sever in their challenges, to the amount of twenty each, peremptorily. See 1 Chit. Cr. Law. 306; 3 Salk. 81: Fost. Crown Law. 106, 107; Co. Litt. 156b; 2 Hale, P. C. 268. The panel being exhausted by the peremptory challenges. and challenges for cause, the court ordered talismen to be called, and a list was made of twenty. which being also exhausted before a jury could be obtained. another list was ordered, and a jury at last was obtained. The talismen, as they were called, were interrogated (at the request of the prisoners' counsel). upon oath. whether they had formed and declared an opinion as to the guilt or innocence of the prisoners. previous to their

being summoned. Those who answered affirmatively, were challenged for cause, and set aside.