CRIST, WARDEN, et al. v. BRETZ et al.

No. 76–1200.   Argued November 1, 1977—Reargued March 22, 1978—
Decided June 14, 1978

STEWART, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 38. BURGER, C. J., filed a dissenting opinion, *post*, p. 39. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 40.

*Robert S. Keller,* Special Assistant Attorney General of Montana, reargued the cause for appellants. With him on the briefs was *Michael T. Greely,* Attorney General.

*W. William Leaphart,* by appointment of the Court, 431 U. S. 963, reargued the cause and filed briefs for appellee Cline. *Charles F. Moses* reargued the cause and filed briefs for appellee Bretz.

*Kenneth S. Geller* argued the cause on the reargument for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General McCree, Assistant Attorney General Civiletti, Deputy Solicitor General Easterbrook,* and *Alan J. Sobol.*

MR. JUSTICE STEWART delivered the opinion of the Court.

This case involves an aspect of the constitutional guarantee against being twice put in jeopardy. The precise issue is whether the federal rule governing the time when jeopardy attaches in a jury trial is binding on Montana through the Fourteenth Amendment. The federal rule is that jeopardy attaches when the jury is empaneled and sworn; a Montana statute provides that jeopardy does not attach until the first witness is sworn.[1]

## I

The appellees, Merrel Cline [2] and L. R. Bretz, were brought to trial in a Montana court on charges of grand larceny, obtaining money and property by false pretenses, and several counts of preparing or offering false evidence. A jury was empaneled and sworn following a three-day selection process. Before the first witness was sworn, however, the appellees filed a motion drawing attention to the allegation in the

---

[1] Montana Rev. Codes Ann. § 95–1711 (3) (1947) provides in pertinent part:

"[A] prosecution based upon the same transaction as a former prosecution is barred by such former prosecution under the following circumstances: . . . (d) The former prosecution was improperly terminated. Except as provided in this subsection, there is an improper termination of a prosecution if the termination is for reasons not amounting to an acquittal, and it takes place after the first witness is sworn but before verdict. . . ."

See also State v. Cunningham, 166 Mont. 530, 535–536, 535 P. 2d 186, 189. In addition to Montana, Arizona also holds that jeopardy does not attach until "proceedings commence," although this may be as early as the opening statement. Klinefelter v. Superior Court, 108 Ariz. 494, 495, 502 P. 2d 531, 532; State v. Mojarro Padilla, 107 Ariz. 134, 139–140, 483 P. 2d 549, 553. Until recently, New York had a similar rule. See Mizell v. Attorney General, 442 F. Supp. 868 (EDNY).

[2] We were informed during argument that the conviction of Merrel Cline has been reversed, see State v. Cline, 170 Mont. 520, 555 P. 2d 724, and the charges against him dismissed. This appeal, therefore, has become moot as to him.

false-pretenses charge that the defendants' illegal conduct began on January 13, 1974.[3] Effective January 1, 1974, the particular statute relied on in that count of the information, Mont. Rev. Codes Ann. § 94–1805 (1947), had been repealed. The prosecutor moved to amend the information, claiming that "1974" was a typographical error, and that the date on which the defendants' alleged violation of the statute had commenced was actually January 13, 1973, the same date alleged in the grand larceny count. The trial judge denied the prosecutor's motion to amend the information and dismissed the false-pretenses count. The State promptly but unsuccessfully asked the Montana Supreme Court for a writ of supervisory control ordering the trial judge to allow the amendment.

Returning to the trial court, the prosecution then asked the trial judge to dismiss the entire information so that a new one could be filed. That motion was granted, and the jury was dismissed. A new information was then filed, charging the appellees with grand larceny and obtaining money and property by false pretenses. Both charges were based on conduct commencing January 13, 1973. Other than the change in dates, the new false-pretenses charge described essentially the same offense charged in the earlier defective count.

After a second jury had been selected and sworn, the appellees moved to dismiss the new information, claiming that the Double Jeopardy Clauses of the United States and Montana Constitutions barred a second prosecution. The motion was denied, and the trial began. The appellees were found guilty on the false-pretenses count, and sentenced to terms of imprisonment. The Montana Supreme Court, which had previously denied appellees habeas corpus relief, *State ex rel. Bretz* v. *Sheriff,* 167 Mont. 363, 539 P. 2d 1191, affirmed the judgment as to Bretz on the ground that under state law

---

[3] The motion asked that the prosecution's evidence be limited to the time period alleged in the information.

jeopardy had not attached in the first trial. *State* v. *Cline,* 170 Mont. 520, 555 P. 2d 724.

In the meantime the appellees had brought a habeas corpus proceeding in a Federal District Court, again alleging that their convictions had been unconstitutionally obtained because the second trial violated the Fifth and Fourteenth Amendment guarantee against double jeopardy. The federal court denied the petition, holding that the Montana statute providing that jeopardy does not attach until the first witness is sworn does not violate the United States Constitution. The court held in the alternative that even if jeopardy had attached, a second prosecution was justified, as manifest necessity supported the first dismissal. *Cunningham* v. *District Court,* 406 F. Supp. 430 (Mont.).[4]

The Court of Appeals for the Ninth Circuit reversed. 546 F. 2d 1336. It held that the federal rule governing the time when jeopardy attaches is an integral part of the constitutional guarantee, and thus is binding upon the States under the Fourteenth Amendment. The appellate court further held that there had been no manifest necessity for the Montana trial judge's dismissal of the defective count, and, accordingly, that a second prosecution was not constitutionally permissible.[5]

Appellants appealed pursuant to 28 U. S. C. § 1254 (2), seeking review only of the holding of the Court of Appeals that Montana is constitutionally required to recognize that, for purposes of the constitutional guarantee against double jeopardy, jeopardy attaches in a criminal trial when the jury is empaneled and sworn. We postponed consideration of probable jurisdiction *sub nom. Crist* v. *Cline,* 430 U. S. 982, and the case was argued. Thereafter the case was set for

---

[4] The *Cunningham* case, involving the same issue, was consolidated with the appellees' case.

[5] In this Court the appellants specifically waived any challenge to the Court of Appeals' ruling on manifest necessity, and we intimate no view as to its correctness.

reargument, 434 U. S. 980, and the parties were asked to address the following two questions:

"1. Is the rule heretofore applied in the federal courts—that jeopardy attaches in jury trials when the jury is sworn—constitutionally mandated?

"2. Should this Court hold that the Constitution does not require jeopardy to attach in any trial—state or federal, jury or nonjury—until the first witness is sworn?"

## II

### A

The unstated premise of the questions posed on reargument is that if the rule "that jeopardy attaches in jury trials when the jury is sworn" is "constitutionally mandated," then that rule is binding on Montana, since "the double jeopardy prohibition of the Fifth Amendment . . . [applies] to the States through the Fourteenth Amendment," and "the same constitutional standards" must apply equally in federal and state courts. *Benton* v. *Maryland,* 395 U. S. 784, 794–795. The single dispositive question, therefore, is whether the federal rule is an integral part of the constitutional guarantee.

The Double Jeopardy Clause of the Fifth Amendment is stated in brief compass: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." But this deceptively plain language has given rise to problems both subtle and complex, problems illustrated by no less than eight cases argued here this very Term.[6] This case, however, presents a single straightforward issue concerning the point during a jury trial when a defendant is deemed to have been put in jeopardy, for only if that point has once been

---

[6] In addition to the present case, see *Arizona* v. *Washington,* 434 U. S. 497; *United States* v. *Wheeler,* 435 U. S. 313; *Burks* v. *United States, ante,* p. 1; *Greene* v. *Massey, ante,* p. 19; *Sanabria* v. *United States, post,* p. 54; *Swisher* v. *Brady,* No. 77–653; *United States* v. *Scott, post,* p. 82.

reached does any subsequent prosecution of the defendant bring the guarantee against double jeopardy even potentially into play. *Serfass* v. *United States,* 420 U. S. 377, 388; *Illinois* v. *Somerville,* 410 U. S. 458, 467.

The Fifth Amendment guarantee against double jeopardy derived from English common law, which followed then, as it does now,[7] the relatively simple rule that a defendant has been put in jeopardy only when there has been a conviction or an acquittal—after a complete trial.[8] A primary purpose served by such a rule is akin to that served by the doctrines of *res judicata* and collateral estoppel—to preserve the finality of judgments.[9] And it is clear that in the early years of our national history the constitutional guarantee against double jeopardy was considered to be equally limited in scope. As Mr. Justice Story explained:

> "[The Double Jeopardy Clause] does not mean, that [a person] shall not be tried for the offence a second time, if the jury shall have been discharged without giving any verdict; . . . for, in such a case, his life or limb cannot judicially be said to have been put in jeopardy." 3 J. Story, Commentaries on the Constitution § 1781, pp. 659–660 (1833).

But this constitutional understanding was not destined to endure. Beginning with this Court's decision in *United*

---

[7] 11 Halsbury's Laws of England ¶ 242 (4th ed. 1976).

[8] Established at least by 1676, *Turner's Case,* 89 Eng. Rep. 158, the rule was embodied in defensive pleas of former conviction or former acquittal. Although the pleas did not mention jeopardy, Blackstone commented that they were based on the "universal maxim . . . that no man is to be brought into jeopardy of his life, more than once, for the same offence." 4 W. Blackstone, Commentaries *335. See generally J. Sigler, Double Jeopardy 1–37 (1969).

[9] See Mayers & Yarbrough, *Bis Vexari:* New Trials and Successive Prosecutions, 74 Harv. L. Rev. 1 (1960). See also M. Friedland, Double Jeopardy 6 (1969); ALI, Administration of the Criminal Law: Double Jeopardy 7 (1935).

*States* v. *Perez,* 9 Wheat. 579, it became firmly established by the end of the 19th century that a defendant could be put in jeopardy even in a prosecution that did not culminate in a conviction or an acquittal, and this concept has been long established as an integral part of double jeopardy jurisprudence.[10] Thus in *Wade* v. *Hunter,* 336 U. S. 684, 688, the Court was able accurately to say: "Past cases have decided that a defendant, put to trial before a jury, may be subjected to the kind of 'jeopardy' that bars a second trial for the same

[10] In perhaps the first expression of this concept, a state court in 1822 concluded that jeopardy may attach prior to a verdict, because "[t]here is a wide different between a verdict given and the jeopardy of a verdict." *Commonwealth* v. *Cook,* 6 Serg. & R. 577, 596 (Pa.).

In the *Perez* case, the trial judge had discharged a deadlocked jury, and the defendant argued in this Court that the discharge was a bar to a second trial. The case has long been understood as standing for the proposition that jeopardy attached during the first trial, but that despite the former jeopardy a second trial was not barred by the Double Jeopardy Clause because there was a "manifest necessity" for the discharge of the first jury. See, *e. g., United States* v. *Tateo,* 377 U. S. 463, 467; *Wade* v. *Hunter,* 336 U. S. 684, 689–690. In fact, a close reading of the short opinion in that case could support the view that the Court was not purporting to decide a constitutional question, but simply settling a problem arising in the administration of federal criminal justice. But to cast such a new light on *Perez* at this late date would be of academic interest only.

In two cases decided in the wake of *Perez* the Court simply followed its precedential authority: *Simmons* v. *United States,* 142 U. S. 148; *Thompson* v. *United States,* 155 U. S. 271. But it had become clear at least by the time of *Kepner* v. *United States,* 195 U. S. 100, decided in 1904, that jeopardy does attach even in a trial that does not culminate in a jury verdict: "[A] person has been in jeopardy when he is regularly charged with a crime before a tribunal properly organized and competent to try him . . . . Undoubtedly in those jurisdictions where a trial of one accused of crime can only be to a jury, and a verdict of acquittal or conviction must be by a jury, no legal jeopardy can attach until a jury has been called and charged with the deliverance of the accused." *Id.,* at 128. See also *United States* v. *Dinitz,* 424 U. S. 600; *United States* v. *Wilson,* 420 U. S. 332, 343–344; *Gori* v. *United States,* 367 U. S. 364.

offense even though his trial is discontinued without a verdict." See also, e. g., *Arizona* v. *Washington,* 434 U. S. 497.

The basic reason for holding that a defendant is put in jeopardy even though the criminal proceeding against him terminates before verdict was perhaps best stated in *Green* v. *United States,* 355 U. S. 184, 187–188:

> "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

Although it has thus long been established that jeopardy may attach in a criminal trial that ends inconclusively, the precise point at which jeopardy does attach in a jury trial might have been open to argument before this Court's decision in *Downum* v. *United States,* 372 U. S. 734.[11] There the Court held that the Double Jeopardy Clause prevented a second prosecution of a defendant whose first trial had ended just after the jury had been sworn and before any testimony had been taken. The Court thus necessarily pinpointed the stage in a jury trial when jeopardy attaches, and the *Downum* case has since been understood as explicit authority for the proposition that jeopardy attaches when the jury is empaneled and sworn. See *United States* v. *Martin Linen Supply Co.,* 430 U. S. 564, 569; *Serfass* v. *United States,* 420 U. S., at 388.

The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a chosen jury. That

---

[11] But see *Kepner* v. *United States, supra,* at 128; n. 10, *supra.*

interest was described in *Wade* v. *Hunter, supra,* as a defendant's "valued right to have his trial completed by a particular tribunal." 336 U. S., at 689. It is an interest with roots deep in the historic development of trial by jury in the Anglo-American system of criminal justice.[12] Throughout that history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict.[13]

Regardless of its historic origin, however, the defendant's "valued right to have his trial completed by a particular tribunal" is now within the protection of the constitutional guarantee against double jeopardy, since it is that "right" that lies at the foundation of the federal rule that jeopardy attaches when the jury is empaneled and sworn. *United States* v. *Martin Linen Supply Co., supra; Serfass* v. *United States, supra,* at 388; *Illinois* v. *Somerville,* 410 U. S., at 467; *United States* v. *Jorn,* 400 U. S. 470, 478–480, 484–485 (plurality opinion).

---

[12] Trial juries were at first merely a substitute for other inscrutable methods of decisionmaking, such as trial by battle, compurgation, and ordeal. See 1 W. Holdsworth, A History of English Law 317 (7th ed. 1956). See also T. Plucknett, A Concise History of the Common Law 125 (5th ed. 1956). They soon evolved, however, into a more rational instrument of decisionmaking—serving as a representative group of peers to sit in judgment on a defendant's guilt.

[13] Illustrative of this tradition was the practice of keeping the jury together unfed and without drink until it delivered its unanimous verdict. See Y. B. Trin. 14 Hen. VII, pl. 4. See Plucknett, *supra,* at 119. As Lord Coke put the matter: "A jury sworn and charged in case of life or member, cannot be discharged by the court or any other, but they ought to give a verdict." 1 E. Coke, Institutes 227 (b) (6th ed. 1861). And an English court said as late as 1866: "[The rule] seems to command the confinement of the jury till death if they do not agree, and to avoid any such consequence an exception was introduced in practice which Blackstone has described by the words 'except in case of evident necessity.'" *Winsor* v. *The Queen,* [1866] 1 Q. B. 390, 394.

## B

It follows that Montana's view as to when jeopardy attaches is impermissible under the Fourteenth Amendment unless it can be said that the federal rule is not "at the core" of the Double Jeopardy Clause. See *Pointer* v. *Texas*, 380 U. S. 400, 406; *Malloy* v. *Hogan*, 378 U. S. 1, 11; *Ker* v. *California*, 374 U. S. 23, 33. In asking us to hold that it is not, appellants argue that the federal standard is no more than an arbitrarily chosen rule of convenience,[14] similar in its lack of constitutional status to the federal requirement of a unanimous verdict by 12 jurors, which has been held not to bind the States. *Apodaca* v. *Oregon*, 406 U. S. 404; *Williams* v. *Florida*, 399 U. S. 78. But see *Ballew* v. *Georgia*, 435 U. S. 223.

If the rule that jeopardy attaches when the jury is sworn were simply an arbitrary exercise of linedrawing, this argument might well be persuasive, and it might reasonably be concluded that jeopardy does not constitutionally attach until the first witness is sworn, to provide consistency in jury and nonjury trials.[15] Indeed, it might then be concluded that the point of the attachment of jeopardy could be moved a few steps forward or backward without constitutional significance.[16]

But the federal rule as to when jeopardy attaches in a jury

---

[14] The United States as *amicus curiae* makes a similar argument.

[15] In nonjury trials jeopardy does not attach until the first witness is sworn. *Serfass* v. *United States*, 420 U. S. 377, 388.

[16] The United States alternatively proposes a due process sliding "interest balancing test" under which the further the trial has proceeded the more the justification required for a midtrial termination. Montana alternatively proposes that jeopardy should not be held to attach until a prima facie case has been made, on the premise that only then will a defendant truly be in jeopardy. The legal literature provides at least one other approach: jeopardy should attach "as soon as the process of selecting the jury begins." See Schulhofer, Jeopardy and Mistrials, 125 U. Pa. L. Rev. 449, 512–514 (1977).

trial is not only a settled part of federal constitutional law. It is a rule that both reflects and protects the defendant's interest in retaining a chosen jury.  We cannot hold that this rule, so grounded, is only at the periphery of double jeopardy concerns.  Those concerns—the finality of judgments, the minimization of harassing exposure to the harrowing experience of a criminal trial, and the valued right to continue with the chosen jury—have combined to produce the federal law that in a jury trial jeopardy attaches when the jury is empaneled and sworn.

We agree with the Court of Appeals that the time when jeopardy attaches in a jury trial "serves as the lynchpin for all double jeopardy jurisprudence." 546 F. 2d, at 1343.  In *Illinois* v. *Somerville, supra,* at 467, a case involving the application of the Double Jeopardy Clause through the Fourteenth Amendment, the Court said that "jeopardy 'attached' when the first jury was selected and sworn." Today we explicitly hold what *Somerville* assumed: The federal rule that jeopardy attaches when the jury is empaneled and sworn is an integral part of the constitutional guarantee against double jeopardy.  The judgment is

*Affirmed.*

Mr. Justice Blackmun, concurring.

Although I join the Court's opinion, I write to emphasize the fact that I am not content to rest the result, as the Court seems to be, *ante,* at 36, solely on the defendant's "valued right to have his trial completed by a particular tribunal," a factor mentioned by Mr. Justice Black, speaking for the Court, in *Wade* v. *Hunter,* 336 U. S. 684, 689 (1949).  That approach would also support a conclusion that jeopardy attaches at the very beginning of the jury selection process.  See Schulhofer, Jeopardy and Mistrials, 125 U. Pa. L. Rev. 449, 512–514 (1977).

Other interests are involved here as well: repetitive stress

and anxiety upon the defendant; continuing embarrassment for him; and the possibility of prosecutorial overreaching in the opening statement.

It is perhaps true that each of these interests could be used, too, to support an argument that jeopardy attaches at some point before the jury is sworn. I would bring all these interests into focus, however, at the point where the jury is sworn because it is then and there that the defendant's interest in the jury reaches its highest plateau, because the opportunity for prosecutorial overreaching thereafter increases substantially, and because stress and possible embarrassment for the defendant from then on is sustained.

MR. CHIEF JUSTICE BURGER, dissenting.

As a "rulemaking" matter, the result reached by the Court is a reasonable one; it is the Court's decision to constitutionalize the rule that jeopardy attaches at the point when the jury is sworn—so as to bind the States—that I reject. This is but another example of how constitutional guarantees are trivialized by the insistence on mechanical uniformity between state and federal practice. There is, of course, no reason why the state and federal rules must be the same. In the period between the swearing of the jury and the swearing of the first witness, the concerns underlying the constitutional guarantee against double jeopardy are simply not threatened in any meaningful sense even on the least sanguine of assumptions about prosecutorial behavior. We should be cautious about constitutionalizing every procedural device found useful in federal courts, thereby foreclosing the States from experimentation with different approaches which are equally compatible with constitutional principles. All things "good" or "desirable" are not mandated by the Constitution. States should remain free to have procedures attuned to the special problems of the criminal justice system at the state and local levels. Principles of federalism should not so readily be com-

promised for the sake of a uniformity finding sustenance perhaps in considerations of convenience but certainly not in the Constitution. Countless times in the past 50 years this Court has extolled the virtues of allowing the States to serve as "laboratories" to experiment with procedures which differ from those followed in the federal courts. Yet we continue to press the States into a procrustean federal mold. The Court's holding will produce no great mischief, but it continues, I repeat, the business of trivializing the Constitution on matters better left to the States.

Accordingly, I join MR. JUSTICE POWELL's dissent.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

The rule that jeopardy attaches in a jury trial at the moment the jury is sworn is not mandated by the Constitution. It is the product of historical accident, embodied in a Court decision without the slightest consideration of the policies it purports to serve. Because these policies would be served equally well by a rule fixing the attachment of jeopardy at the swearing of the first witness, I would uphold the Montana statute. Even if one assumed that the Fifth Amendment now requires the attachment of jeopardy at the swearing of the jury, I would view that rule as incidental to the purpose of the Double Jeopardy Clause and hence not incorporated through the Due Process Clause of the Fourteenth Amendment and not applicable to the States. I therefore dissent.

## I

As the Court correctly observes, *ante,* at 33, it is clear that in the early years of our national history the constitutional guarantee against double jeopardy was restricted to cases in which there had been a complete trial—culminating in acquittal or conviction. The limited debate on the Double Jeopardy Clause in the House of Representatives confirms this proposi-

tion. 1 Annals of Cong. 753 (1789). See generally *United States* v. *Wilson,* 420 U. S. 332, 339–342 (1975). This was consonant with the prevailing English practice regarding pleas in bar. The pleas of *autrefois acquit* and *autrefois convict,* which implemented the maxim, repeated by Blackstone, that no man should twice be placed in jeopardy for the same offense,[1] could be interposed only on the basis of an actual verdict of acquittal or conviction.[2] It was to these pleas in bar—which embody a res judicata policy, as the Court describes it, *ante,* at 33—that the Double Jeopardy Clause was directed. See, *e. g., United States* v. *Haskell,* 26 F. Cas. 207, 212 (No. 15,321) (CC Pa. 1823) (Washington, J.); *People* v. *Goodwin,* 18 Johns. 187, 205 (N. Y. Sup. Ct. 1820); cf. *People* v. *Olcott,* 2 Johns. Cas. 301 (N. Y. Sup. Ct. 1801) (Kent, J.). This remains the English rule. See n. 2, *supra.*

But there existed a separate rule of English practice that has become intertwined with the doctrine of pleas in bar in the development of our Double Jeopardy Clause. This was the rule, based upon a dictum of Lord Coke, that once the "[j]ury is retorned and sworn, their verdict must be heard, and they cannot be discharged . . . ." 3 E. Coke, Institutes 110 (6th ed. 1681); accord, 1 *id.,* at 227 (b). That this rule arose as an aspect of jury practice, rather than as an element of the guarantee against double jeopardy, is supported by several facts. First, it applied in civil cases as well as criminal. Kirk, "Jeopardy" During the Period of the Year Books, 82 U. Pa. L. Rev. 602, 609 (1934). Second, the early cases and treaties laid down no clear standard as to the effect of a failure to follow the rule. See, *e. g.,* C. St. Germain, Doctor and Student 1531, Dialogue 2, ch. 52 (1970). Third, it seems never to have been pleaded successfully in bar of a second

---

[1] 4 W. Blackstone, Commentaries \*335. See also 3 E. Coke, Institutes 213–214 (6th ed. 1681).

[2] J. Archbold, Pleading, Evidence & Practice in Criminal Cases §§ 435–459 (35th ed. 1962).

prosecution in the period of the Year Books, when the rule is said to have arisen.  Kirk, *supra*, at 611.  Fourth, Blackstone dealt with the rule governing the discharge of the jury not in his section on pleas in bar but in his discussion dealing with verdicts.  Compare 4 W. Blackstone, Commentaries *335–*338, with *id.*, at *360.[3]  Hence, it is reasonably clear that the rule forbidding discharge of the jury arose out of the circumstances of medieval England, "when jurors of the counties where the facts occurred were summoned to give testimony at Westminster on a trial based on those facts.  It seems not to have been an invariable rule and has never been found to have had any connection, in the cases at English common law, with the problem of two trials for the same offense."  Kirk, *supra*, at 612 (footnote omitted).

Notwithstanding its origin as an aspect of jury practice, the rule against discharge of the jury became a useful defense against Crown oppression in the 17th century.  Reaction to the "tyrannical practice," *The Queen* v. *Charlesworth*, 1 B. & S. 460, 500, 121 Eng. Rep. 786, 801 (Q. B. 1861), of discharging juries and permitting reindictment when acquittal appeared likely [4] was so strong that the common-law judges

---

[3] Interestingly, Blackstone wrote that the jury could not be discharged, not as soon as it was sworn, but only after evidence had been introduced. 4 W. Blackstone, Commentaries *360. A relatively recent edition of Blackstone, compiled from the earliest editions, indicates that the close of the evidence may have been the point at which the rule against discharge of the jury originally was fixed by that authority.  J. Ehrlich, Ehrlich's Blackstone 941 (1959).

[4] 2 M. Hale, Pleas of the Crown 294–295 (W. Stokes & E. Ingersoll ed. 1847).  In the infamous *Ireland's Case*, 7 How. St. Tr. 79 (1678), five defendants were accused of high treason.  The court permitted the jury to deliberate as to three defendants, but instructed the jury that the evidence against Whitebread and Fenwick was not sufficient to convict, even though "so full, as to satisfy a private conscience." *Id.*, at 121.  The court therefore discharged the jury of those two, declaring that it would "be convenient, from what is already proved, to have them stay until more proof may come in." *Ibid.*  They were reindicted, convicted, and executed,

declared "that in all capital cases, a juror cannot be withdrawn, though the parties consent to it; that in criminal cases, not capital, a juror may be withdrawn, if both parties consent, but not otherwise . . . ." *The King* v. *Perkins,* Holt. 403, 90 Eng. Rep. 1122 (K. B. 1698). Whether or not this strict rule was ever stringently applied, it was modified soon after it was announced. *The King* v. *Kinloch,* Fost. 16, 168 Eng. Rep. 9 (K. B. 1746). In any event, it seems never to have furnished the basis for a plea of *autrefois acquit.* Rather, it was viewed as a matter committed to the discretion of the trial judge, from which no writ of error would lie nor any plea in bar of a future prosecution would be allowed. *The Queen* v. *Winsor,* 10 Cox C. C. 276, 313–323, 325–326 (Q. B. 1865); *The Queen* v. *Charlesworth, supra,* at 507–515, 121 Eng. Rep., at 803–806.[5] Thus, while the English judges had adapted Lord Coke's rule to the protection of interests later recognized in this country as within the sphere of the Double Jeopardy Clause, compare *The Queen* v. *Winsor, supra,* at 301–302, with *Green* v. *United States,* 355 U. S. 184, 187–188 (1957), they refused to import the rule into the realm of pleas in bar, and it was the latter which informed the framing of the Double Jeopardy Clause.

But it was the common-law rule of jury practice—a rule that we well might have come to regard as an aspect of due process if it had not been absorbed in this country by the

---

*Whitebread's Case,* 7 How. St. Tr. 311 (1679), despite their pleas of former jeopardy, *id.,* at 315–318.

[5] In *Conway and Lynch* v. *The Queen,* 7 Ir. 149 (Q. B. 1845), the Irish Court of Queen's Bench did review on writ of error the prisoners' convictions after reindictment, holding that where the trial judge failed to state on the record the condition of necessity which had prompted the discharge of the first jury, there was an abuse of discretion preventing subsequent trial. The English Court of Queen's Bench, however, rejected this view in *Charlesworth* and in *Winsor.* Indeed, that court adopted the view of Justice Crampton, who had dissented in *Conway and Lynch.*

Double Jeopardy Clause—with which this Court concerned itself in *United States* v. *Perez,* 9 Wheat. 579 (1824). Sitting on the *Perez* Court was Mr. Justice Washington, who one year earlier had written that "the jeopardy spoken of in [the Fifth Amendment] can be interpreted to mean nothing short of the acquittal or conviction of the prisoner, and the judgment of the court thereupon." *United States* v. *Haskell,* 26 F. Cas., at 212. Mr. Justice Story authored the opinion of the Court in *Perez.* Nine years later he would explain in his treatise on the Constitution that the meaning of the Double Jeopardy Clause is "that a party shall not be tried a second time for the same offence, after he has once been convicted, or acquitted of the offence charged, by the verdict of a jury, and judgment has passed thereon for or against him." 3 J. Story, Commentaries on the Constitution § 1781, p. 659 (1833).[6] It seems most unlikely that either of these Members of the *Perez* Court thought that the decision was interpreting the Fifth Amendment when it declared that the discharge of a jury, before verdict, on grounds of "manifest necessity" was not a bar to a retrial.[7] 9 Wheat., at 580. As both Justices Washington and Story believed that the Double Jeopardy Clause embraced only actual acquittal and conviction, they must have viewed *Perez* as involving the independent rule barring needless dis-

---

[6] See also *United States* v. *Coolidge,* 25 F. Cas. 622 (No. 14,858) (CC Mass. 1815) (Story, J.). Despite the view clearly expressed in Mr. Justice Story's Commentaries, there is some evidence that by the year following its publication he was beginning to consider the rule against discharge of the jury as embodying some double jeopardy concerns. See *United States* v. *Gibert,* 25 F. Cas. 1287, 1295–1296 (No. 15,204) (CC Mass. 1834).

[7] That *Perez* was not concerned with pleas in bar—and therefore not with the Double Jeopardy Clause—is supported by its recognition of the doctrine of manifest necessity. No "necessity"—for example, discovery of incontrovertible evidence that a previously acquitted person was guilty—sufficed to overcome a valid plea in bar. Necessity went only to the propriety of discharging the jury. See *United States* v. *Bigelow,* 14 D. C. 393, 401–403 (1884).

charges of the jury.[8]  The decisions of this Court throughout the 19th and early 20th centuries dealing with discharges of the jury are ambiguous, but can be read merely as reaffirming the principle of *Perez* that discharges before verdict may be justified by manifest necessity, without adding a Fifth Amendment gloss.[9]

Throughout the 19th century, however, many state courts began to blend the rule against needless discharges of juries into the guarantee against double jeopardy contained in the Federal and State Constitutions.[10]  It was recognized that the

---

[8] The Court recognizes that *Perez* probably cannot be viewed as a double jeopardy case. *Ante*, at 34 n. 10.

[9] *Simmons* v. *United States,* 142 U. S. 148 (1891); *Logan* v. *United States,* 144 U. S. 263 (1892); *Thompson* v. *United States,* 155 U. S. 271 (1894); *Dreyer* v. *Illinois,* 187 U. S. 71 (1902); *Lovato* v. *New Mexico,* 242 U. S. 199 (1916).  See also *United States* v. *Morris,* 26 F. Cas. 1323 (No. 15,815) (CC Mass. 1851) (Curtis, J.).  But see *Keerl* v. *Montana,* 213 U. S. 135 (1909); cf. *Kepner* v. *United States,* 195 U. S. 100, 128 ˙(1904).  See also *United States* v. *Shoemaker,* 27 F. Cas. 1067 (No. 16,279) (CC Ill. 1840); *United States* v. *Watson,* 28 F. Cas. 499 (No. 16,651) (SDNY 1868).

[10] See, *e. g., State* v. *Garrigues,* 2 N. C. 188 (1795) (*semble*); *Commonwealth* v. *Cook,* 6 Serg. & R. 577 (Pa. 1822); *State* v. *M'Kee,* 1 Bailey 651 (S. C. 1830); *Mahala* v. *State,* 18 Tenn. 532 (1837); *State* v. *Roe,* 12 Vt. 93 (1840); *Morgan* v. *State,* 13 Ind. 215 (1859); *People* v. *Webb,* 38 Cal. 467 (1869); *Nolan* v. *State,* 55 Ga. 521 (1875); *Teat* v. *State,* 53 Miss. 439 (1876); *Ex parte Maxwell,* 11 Nev. 428, 435 (1876); *Mitchell* v. *State,* 42 Ohio St. 383 (1884); *State* v. *Ward,* 48 Ark. 36, 2 S. W. 191 (1886); *People* v. *Gardner,* 62 Mich. 307, 29 N. W. 19 (1886); *Commonwealth* v. *Hart,* 149 Mass. 7, 20 N. E. 310 (1889); *State* v. *Paterno,* 43 La. Ann. 514, 9 So. 442 (1891); *McDonald* v. *State,* 79 Wis. 651, 48 N. W. 863 (1891); *State* v. *Sommers,* 60 Minn. 90, 61 N. W. 907 (1895); *Dulin* v. *Lillard,* 91 Va. 718, 20 S. E. 821 (1895).  But see, *e. g., People* v. *Goodwin,* 18 Johns. 187 (N. Y. Sup. Ct. 1820); *Commonwealth* v. *Wade,* 34 Mass. 395 (1835); *Hoffman* v. *State,* 20 Md. 425, 433 (1863); *United States* v. *Bigelow,* 14 D. C. 393 (1884); *State* v. *Van Ness,* 82 N. J. L. 181, 83 A. 195 (1912).

American treatises also included the rule against discharge of the jury under the heading of Double Jeopardy.  See M. Bigelow, Estoppel 36 (2d

discharge rule provided significant protection against being twice vexed:

> "The right of trial by jury is of but little value to the citizen in a criminal prosecution against him if [the guarantee against double jeopardy] can be violated and the accused left without remedy. If the judge can arbitrarily discharge and impanel juries until one is obtained that will render such a verdict as the state demands, or the attorney for the prosecution desires, and the only protection against such oppression is that a new trial may be ordered in the court trying him, or by the court of last resort, then of what value is this boasted right?" *O'Brian v. Commonwealth,* 72 Ky. 333, 339 (1873).

Cf. *Green v. United States,* 355 U. S., at 187–188. Thus, the state courts were putting Lord Coke's rule to a use similar to that of the 17th-century English judges, but they did so—with no apparent awareness of the novelty of their action—under the rubric of the Double Jeopardy Clause. Given this rather unreflective incorporation of a common-law rule of jury practice into the guarantee against double jeopardy, it is not surprising that the state courts also generally fixed the attachment of jeopardy at the swearing of the jury.[11] Because the

---

ed. 1876); 1 J. Bishop, Commentaries on the Criminal Law § 1016 (5th ed. 1872); T. Cooley, Constitutional Limitations 325–327 (2d ed. 1871). See generally ALI, Administration of the Criminal Law, Commentary to § 6, pp. 61–72 (1935). The leading English criminal law treatise was to the contrary. See 1 J. Chitty, Criminal Law 451–463, 480 (J. Perkins ed. 1847).

[11] See, *e. g., State* v. *M'Kee, supra,* at 655; *Morgan* v. *State, supra,* at 216; *State* v. *Redman,* 17 Iowa 329, 333 (1864); *People* v. *Webb, supra,* at 478; *Nolan* v. *State, supra,* at 523; *State* v. *Davis,* 80 N. C. 384 (1879); *Mitchell* v. *State, supra,* at 393; *State* v. *Ward, supra,* at 38, 2 S. W. 191; *People* v. *Gardner, supra,* at 311, 29 N. W., at 20; *State* v. *Paterno, supra,* at 515, 9 So. 442; *McDonald* v. *State, supra,* at 653, 48 N. W., at 864; *State* v. *Sommers, supra,* at 91, 61 N. W. 907; *Dulin* v. *Lillard, supra,* at 722, 20 S. E., at 822; accord, Bishop, *supra,* n. 10; Cooley, *supra,* n. 10.

state courts do not appear to have been aware that they were adapting a separate rule to a different area of individual rights, they perceived no need to examine all the trappings of the rule in light of the new uses to which it was being put.[12]

It was after more than a century of development in state courts that the "defendant's valued right to have his trial completed by a particular tribunal" appeared in the decisions of this Court for the first time, also without analysis, as an element of the Double Jeopardy Clause. *Wade* v. *Hunter,* 336 U. S. 684, 689 (1949). The policies underlying this "valued right" were not spelled out in *Wade,*[13] but the rationale expressed in *Green* v. *United States, supra,* at 187–188—a case not involving midtrial discharge of the jury—appears to echo the state courts of a century earlier:

> ". . . [T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

Although neither *Wade* nor *Green* confronted the question of when jeopardy attached, the *Green* Court declared that "[t]his Court, as well as most others, has taken the position that a defendant is placed in jeopardy once he is put to trial before a jury so that if the jury is discharged without his consent he cannot be tried again." 355 U. S., at 188.

Having accepted almost without articulated thought the doctrine that the Double Jeopardy Clause protects against needless discharge of the jury, this Court proceeded to adopt

---

[12] But see *United States* v. *Bigelow, supra.*

[13] Similarly, the Court today does not explore the reasons supporting valuation of this particular right, merely announcing that it is "valued." *Ante,* at 38.

48

with a similar lack of reason or analysis the implementing rule that jeopardy attaches when the jury is sworn. In *Downum* v. *United States,* 372 U. S. 734 (1963), the trial court declared a mistrial after the jury had been sworn but before any witnesses had been called. Finding an absence of "imperious necessity," *id.,* at 736, the Court held that the Fifth Amendment barred reprosecution. The *Downum* opinion contains no discussion of the point of jeopardy's attachment or of the policies underlying the selection of the swearing of the jury as the determinative moment.[14] Nevertheless, the swearing of the jury has been accepted since *Downum* as the constitutional line of demarcation for the attachment of jeopardy, see, *e. g., Illinois* v. *Somerville,* 410 U. S. 458, 466 (1973); *United States* v. *Sisson,* 399 U. S. 267, 305 (1970), even though no case before this Court has presented a contest over that issue.[15]

This Court, following the lead of the state courts, simply enlisted the doctrine concerning needless discharge of juries in the service of double jeopardy principles, largely without anal-

---

[14] The Government in *Downum* conceded that jeopardy attaches at the time the jury is sworn. Brief for United States, O. T. 1962, No. 489, p. 31. In support of this concession, the Government cited *Lovato* v. *New Mexico,* 242 U. S. 199 (1916), apparently believing that *Lovato* had involved discharge of the jury immediately after swearing. In that case, however, the witnesses for both sides had been sworn, so that it actually furnished no support for the concession. Since the parties did not dispute the point of jeopardy's attachment, the Court did not discuss the matter. Because the rule of attachment was not put in issue and not discussed in *Downum,* we owe this *sub silentio* determination less deference than a holding arrived at after full argument and consideration, see *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 709–710, n. 6 (1978) (Powell, J., concurring), particularly in a constitutional case.

[15] In *Serfass* v. *United States,* 420 U. S. 377 (1975), the petitioner sought to have the point of attachment moved forward to the filing of pretrial motions. The Court's refusal to fix the attachment of jeopardy at that stage of the litigation did not require any consideration of the policies underlying the rule assumed in *Downum* and reaffirmed today.

ysis and apparently with little awareness of history. In view, however, of the consistency with which federal courts have assumed without question that the swearing of the jury triggers jeopardy, I would accept this as the established supervisory rule within the federal system. But the acceptance of a supervisory rule, primarily on grounds of long tenure and convenience, is no justification for elevating it to constitutional doctrine. We should be hesitant to constitutionalize a rule that derives no support from the Framers' understanding of the English practice from which the Double Jeopardy Clause was derived, and which is supported by no doctrinal reasoning that reaches constitutional dimension. Restraint is doubly indicated with respect to this rule since it is applied only in jury trials. Where a criminal case is tried to the court, jeopardy does not attach until "the court begins to hear evidence." *Serfass* v. *United States,* 420 U. S. 377, 388 (1975). No compelling reason has been suggested today, or in earlier decisions of this Court, why the time when jeopardy attaches should be different depending upon whether the defendant's "valued right" is asserted in a jury trial rather than a bench trial.

I turn next to an examination of the jury trial rule in light of the double jeopardy policies it is now belatedly thought to advance.

## II

Three aspects of criminal process ordinarily precede the initial introduction of evidence in a jury trial: motions, jury selection, and opening statements. Defendants are vitally interested in each, yet it is far from clear that any should trigger the attachment of jeopardy.

Defendants may, and sometimes must, see, *e. g.,* Fed. Rule Crim. Proc. 12, move for various rulings on the indictment and the admissibility of evidence before trial. These motions, in practical terms, may decide the defendant's case. They

sometimes may require a devotion of time, energies, and resources exceeding that necessary for the trial itself. Yet it has never been held that jeopardy attaches as of the making or deciding of pretrial motions. See *Serfass* v. *United States, supra.* Appellee does not contend otherwise. It is clear, then, that the central concern of the Double Jeopardy Clause cannot be regarded solely as protecting against repeated expenditures of the defendant's efforts and resources.

Opening statements may be made in both bench and jury trials.[16] In either type of trial, statements by counsel or questions by the court may prompt the prosecutor to abort—by dismissing the indictment or otherwise—the proceedings with the view to reindicting the defendant and commencing anew. The prosecutor also may simply request a continuance to gain time to meet some unexpected defense stratagem, although such a motion rarely would prevail. In any event, delay or postponement occasioned during or as a result of the opening-statement phase of a trial would be equally adverse to the defendant without regard to whether he were being tried by the court or a jury. The Due Process Clause would protect such a defendant in either case against prosecutorial abuse. Thus, with respect to the opening-statement phase of a criminal trial, there appears to be no difference of substance between jury and bench trials in terms of serving double jeopardy policies.

The situation does differ in some respects where a jury is selected, and the defendant—by *voir dire* and challenges—participates in the selection of the factfinder. It is not unusual for this process to entail a major effort and extend over a protracted period. But, as in the case of pretrial

---

[16] Apparently, defense counsel often choose to reserve their opening statements until the close of the prosecution's case. Tr. of Oral Arg. 10, 15–17; Brief on Reargument for United States as *Amicus Curiae* 23 n. 25. Where this course is followed, there will be no early disclosure of defense strategy.

motions, expenditure of effort alone is not sufficient to trigger the attachment of jeopardy.[17] The federal rule of attachment in jury trials offers no basis for a double jeopardy claim if the prosecutor—dissatisfied by the jury selection process—is successful in dismissing the prosecution before the last juror is seated, or indeed before the whole panel is sworn. A defendant's protection against denial or abuse of his rights in this respect lies in the Due Process Clause.

Moreover, the Double Jeopardy Clause cannot be viewed as a guarantee of the defendant's claim to a factfinder perceived as favorably inclined toward his cause. That interest does not bar pretrial reassignment of his case from one judge to another, even though he may have waived jury trial on the belief that the original judge viewed his case favorably. Thus, the Double Jeopardy Clause interest in having his "trial completed by a particular tribunal," *Wade* v. *Hunter,* 336 U. S., at 689, must refer to some interest other than retaining a factfinder thought to be disposed favorably toward defendant.

The one event that can distinguish one factfinder from another in the eyes of the law in general, and the Double Jeopardy Clause in particular, is the beginning of the factfinder's work. As the Court stated in *Green,* "a defendant is placed in jeopardy once he is *put to trial* before" a factfinder. 355 U. S., at 188 (emphasis added). When the court or jury has undertaken its constitutional duty—the hearing of evidence—the trial quite clearly is under way, and the prosecution's case has begun to unfold before the trier of fact. Cf. *United States* v. *Scott, post,* at 101. As testimony commences, the evidence of the alleged criminal conduct is presented to the

---

[17] At least one commentator has proposed fixing jeopardy's attachment at the start of *voir dire,* in order to protect the defendant's interest in each juror, as selected. Schulhofer, Jeopardy and Mistrials, 125 U. Pa. L. Rev. 449, 513 (1977). This proposal, however, has no historical foundation nor any clear grounding in the concerns of the Double Jeopardy Clause.

factfinder and becomes a matter of *public* record. The defendant's public embarrassment and anxiety begin. From this point on, retrial will mean repeating painful and embarrassing testimony, together with the possibility that the earlier "trial run" will strengthen the prosecution's case. At a retrial, for example, prosecution witnesses may be better prepared for the rigors of cross-examination. Thus, the defendant has a strong interest in taking his case to the first jury, once witnesses testify. *Carsey* v. *United States,* 129 U. S. App. D. C. 205, 208–209, 392 F. 2d 810, 813–814 (1967) (Leventhal, J., concurring). The rationale of the Double Jeopardy Clause is implicated once this threshold is crossed, but not before.

That this is the crucial time for Double Jeopardy Clause purposes is evident from the attachment rule in bench trials. Once the judge has embarked upon his factfinding mission, the defendant is justified in concluding that his ordeal has begun; he is in the hands of his judge and may expect the matter to proceed to a finish. This same principle should apply in jury trials.

Thus, Montana's rule fixing the attachment of jeopardy at the swearing of the first witness is consonant with the central concerns of the Double Jeopardy Clause. It furnishes a clear line of demarcation for the attachment of jeopardy, and it places that line in advance of the point at which real jeopardy—in Fifth Amendment terms—can be said to begin.

## III

Even if I were to conclude that the Fifth Amendment— merely by virtue of long, unreasoned acceptance—required attachment of jeopardy at the swearing of the jury, I would not hold that the Fourteenth Amendment necessarily imposes that requirement upon the States. This issue would turn on the answer to the question whether jeopardy's attachment at that point is fundamental to the guarantees of the Double Jeopardy Clause. *Apodaca* v. *Oregon,* 406 U. S. 404, 373 (1972) (POWELL, J., concurring in judgment); *Ludwig* v.

*Massachusetts,* 427 U. S. 618, 632 (1976) (POWELL, J., concurring). As the previous discussion makes clear, the jury trial rule accorded constitutional status by the Court today implicates no rights that have been identified as fundamental in a constitutional sense. There is no basis for incorporating it "jot-for-jot" into the Fourteenth Amendment. See *Duncan* v. *Louisiana,* 391 U. S. 145, 181 (1968) (Harlan, J., dissenting).

## IV

Aside from paying cryptic homage to the hitherto unexplained "valued right" to a particular jury, the Court does not even attempt to justify its holding that the Fifth Amendment mandates the rule of attachment that it adopts. It identifies no policy of the Double Jeopardy Clause, and no interests of a fair system of criminal justice, that elevate this "right" to constitutional status. The Court's rule is not even a "linedrawing" that finds support in logic or significant convenience.

I perceive no reason for this Court to impose what, in effect, is no more than a supervisory rule of practice upon the courts of every State in the Union.