James Jerry SMITHWICK, Appellant,

v.

The STATE of Texas, State.

No. 2–85–261–CR.

Court of Appeals of Texas,
Fort Worth.

June 18, 1987.

Rehearing Denied July 30, 1987.

Bill Magnussen, Alley & Alley and Richard Alley, Fort Worth, for appellant.

Dan B. Grissom, Dist. Atty., and Andrew Ottaway, Asst. Dist. Atty., Granbury, for appellee.

Before BURDOCK, JOE SPURLOCK, II and HILL, JJ.

## OPINION

HILL, Justice.

James Jerry Smithwick appeals from his conviction by a jury of the offense of aggravated assault. The jury assessed his punishment at eight years in the Texas Department of Corrections and a fine of $5,000. Smithwick presents six points of error.

We affirm.

In point of error numbers one and two Smithwick complains that he was denied effective assistance of counsel on appeal due to the counsel's failure to bring forward a statement of facts from a prior trial of this case which had resulted in a mistrial. He also complains of the fact that the jury's notes and the judge's reply thereto from the first trial were not included in the appellate record. Since the filing of Smithwick's brief, the record has been supplemented to supply the missing material. Since the record has now been supplemented so that it includes these materials, we find any error in their initial exclusion to be harmless beyond a reasonable doubt. Although Smithwick complains of other items not included in the appellate record, we have not been referred to any place in the record which would show that such items existed. In any event, the record is sufficiently complete for the purpose of this appeal. We overrule points of error numbers one and two.

In points of error numbers three and four, Smithwick contends that the trial court abused its discretion in granting a mistrial in the first trial and that the second trial violated his right to avoid double jeopardy as provided by the fifth, sixth and fourteenth amendments to the United States Constitution and by sections 3, 10, 13, 14 and 19 of article I of the Texas Constitution.

A criminal defendant cannot be twice put in jeopardy for the same offense. U.S. CONST. amend. V; TEX.CODE CRIM.PROC.ANN. art. 1.10 (Vernon 1977). In a jury trial, jeopardy attaches when the jury panel is impaneled and sworn to try the case. *See Crist v. Bretz*, 437 U.S. 28, 38, 98 S.Ct. 2156, 2162, 57 L.Ed.2d 24, 33 (1978); *Torres v. State*, 614 S.W.2d 436, 441 (Tex.Crim.App.1981). Once jeopardy attaches, the defendant possesses a valued right to have his guilt or innocence determined by the jury impaneled. *See Torres*, 614 S.W.2d at 441.

In this case the trial court declared a mistrial after the jury had deliberated and declared that it was deadlocked. The jury began deliberations shortly after 11:00 a.m. and concluded with the trial court's declaration of a mistrial at 3:45 p.m.

TEX.CODE CRIM.PROC.ANN. art. 36.31 (Vernon 1981) provides as follows:

After the cause is submitted to the jury, it may be discharged when it cannot agree and both parties consent to its

discharge; or the court may in its discretion discharge it where it has been kept together for such time as to render it altogether improbable that it can agree.

TEX.CODE CRIM.PROC.ANN. art. 36.-33 (Vernon 1981) provides:

When a jury has been discharged, as provided in the four preceding Articles, without having rendered a verdict, the cause may be again tried at the same or another term.

■ The exercise of discretion by the trial court, in discharging the jury upon its own motion, is measured by the amount of time the jury deliberated in light of the nature of the case and the evidence. *See Satterwhite v. State*, 505 S.W.2d 870, 871 (Tex.Crim.App.1974). In order to determine whether a jury has been prematurely discharged, we must know some of the facts to indicate the amount and length of testimony the jury was called upon to consider in its deliberations, we must know the time consumed by the trial and then weigh this time element against the time that the jury deliberated prior to discharge. *Id.*

■ The record reflects that the voir dire lasted for approximately two hours. The presentation of the evidence required approximately four hours, forty-five minutes.

After approximately two hours and twenty minutes of deliberations, the jury indicated to the court that it was deadlocked. The court instructed the jury to continue its deliberations. After an additional two hours and ten minutes of deliberation, the jury again informed the judge that it was deadlocked. The jury apparently lunched during its deliberation. The jury was not recessed for any appreciable length of time. The judge then conducted the following inquiry into the status of the jury's deliberations.

THE COURT: Just have a seat, ladies and gentlemen. Let's see, Mr. Purdue, you are the jury foreman; is that correct?

JUROR PURDUE: Yes.

THE COURT: All right. I received this note here, note number five stating that there's still no decision made, that it's locked, and that is your note in regard to your present status; is that correct?

JUROR PURDUE: Yes, sir.

THE COURT: Let's see. It's about 3:45, 3:50. At this time I received a note, the note number three at 1:25 p.m. a couple of hours ago which you stated then that you were in deadlock; is that correct?

JUROR PURDUE: Yes, sir.

THE COURT: Has there been any progress made with regard to your vote as it stood at that time since that time?

JUROR PURDUE: No, sir, it's still the same.

THE COURT: Still the same. Without revealing what the vote is, can you tell me what the numbers are? That is, are you 11 to 1, 10 and 2, whatever? How are you leaning?

JUROR PURDUE: It's 11 to 1.

THE COURT: 11 to 1?

JUROR PURDUE: Yes, sir.

THE COURT: All right. Do you feel that further time spent in discussion of this, deliberations will improve the possibility of securing a judgment, a verdict in the case?

JUROR PURDUE: Yes, sir, I feel like there was a little bit of lack of evidence on that. You know, cause us to have different beliefs about things.

THE COURT: Well, what I—I probably didn't make myself clear enough but what I'm saying is you feel like if y'all retired and deliberated a little bit further that will improve the chances of your securing a verdict here?

JUROR PURDUE: No, sir, I really don't.

THE COURT: You feel like you're hopelessly deadlocked then; is that correct?

JUROR VENUE: Yes, sir.

THE COURT: Does everyone else on the jury agree with that?

(Affirmative response from jury panel.)

THE COURT: All right. I see the affirmative nod of twelve heads there.

All right. Let's see, you've been in deliberation since 11:05, so it's close to five hours, I guess. Five hours of deliberations. Based on your statements here and your representations to me, I will—at this time I'll declare a mistrial in the case because of your inability to arrive at a verdict in the case and I will, accordingly, declare a mistrial in the case.

We find that the trial court did not abuse its discretion in granting the mistrial. *See Munguia v. State,* 603 S.W.2d 876, 878 (Tex.Crim.App.1980); *Green v. State,* 167 Tex.Cr.R. 330, 320 S.W.2d 139, 140–41 (1958).

Smithwick relies on the cases of *Beeman v. State,* 533 S.W.2d 799, 801 (Tex.Crim.App.1976) and *O'Brien v. State,* 455 S.W.2d 283, 285 (Tex.Crim.App.1970). In the first trial in *Beeman,* the voir dire alone had taken two days. During just two hours of deliberation, the jury split went from 6–6 to 8–4 to 10–2. The court held, and we agree, that the trial court abused its discretion by declaring a mistrial without the defendant's consent. In *O'Brien,* the trial testimony took approximately two hours. The jury deliberated one hour and ten minutes. The trial court, without sending the jury back for further deliberation, declared a mistrial after the jury reported back that it was unable to reach a verdict and that the jury stood 7–5. We also agree with the opinion in that case. We find both of these cases distinguishable in that the deliberations in the case at bar were much longer, and there was no movement, in that the jury had twice announced that it was split 11–1. The trial court, at the time he declared a mistrial, had already instructed the jury to deliberate further. We overrule points of error numbers three and four.

In points of error numbers five and six, Smithwick urges that the jury's verdict rejecting his claim of self-defense is against the great weight and preponderance of the evidence, and that the evidence is insufficient to support the jury's verdict because no rational trier of fact could have found that he had failed to prove his affirmative defense of self-defense by a preponderance of the evidence.

■ In reviewing a case involving an affirmative defense, we must review the evidence on the affirmative defense by looking at the evidence in the light most favorable to the implicit finding by the jury with respect to such affirmative defense and then determine, by examining all the evidence concerning the affirmative defense, if any rational trier of fact could have found that the defendant failed to prove his defense by a preponderance of the evidence. *See Van Guilder v. State,* 674 S.W.2d 915 (Tex.App.—San Antonio 1984), *aff'd,* 709 S.W.2d 178, 179 (Tex.Crim.App.1985).

■ Barbara Willburn, the complainant, testified that she and her husband were invited over to Smithwick's house on May 25, 1985. She said that she had known Smithwick and his wife for over three years. She related that she went there around 2:00 p.m., carrying some Vodka with her. Her husband took beer. Later, she returned to her home with some of the other guests. She brought her Coleman lantern back to the party so the men could use it to play dominoes out in the yard. Everyone at the party drank all day. She drank vodka mixed with chocolate milk. She said she took a nap at the party and woke up about 11:30 p.m. She and her husband got in an argument because she wanted to go home and he did not. She said she started arguing with Smithwick but could not remember what the argument was about. She related that Smithwick told her to get out of his house. She said that she told him that when she did, her things were going with her. Next, she dumped the party's beer out of her ice chest, which Smithwick had had in his possession for two months or more. She testified that Smithwick told her to get down and pick up the beer. Instead, she said that she told him she wanted her lantern too. She testified that Smithwick went over and got the lantern, said "you want your lantern, you can have it," then hit her in the eye with it, knocking her to the ground. She said that he hit her with the lantern again while she was on the ground. She swore that she did not remember

whether she had a gun or not. Mrs. Willburn lost an eye as a result of being struck by the lantern.

Gilbert Willburn, Barbara's husband, supported his wife's testimony as to the level of drinking at the party. His version of the assault was similar to that of his wife, except that he could not say what Smithwick said to Barbara just before he hit her with the lantern.

Nancy Welch, another party-goer, said that Smithwick and Barbara were arguing. She testified that she saw Smithwick swing the lantern. She said she could not see exactly what was going on, because she was inside the house. Smithwick was in the doorway, and she could not see past him. She testified that she could not hear what either said. She said that she and her companion, Roy Crumpton, spent the night with the Smithwicks, that they talked about the event, but she could not remember anything in particular that anyone said. She said that she did not hear anything about a gun.

Roy Crumpton, Nancy Welch's companion, testified that he thought he saw Smithwick swing the lantern twice. He also said that he did not actually see anything, that as much as he had had to drink that he was not sure about anything. He said that afterward Smithwick did not say anything about a gun, but that he could not remember what Smithwick did say.

Terri Smithwick, the wife of appellant, testified that Barbara Willburn carried a gun in her purse all the time and that Barbara took tranquilizers and codeine, sometimes while drinking. She said that prior to the assault, Barbara had her gun out and her husband Gilbert told her to put it away. Terri said that she had told the appellant prior to the assault that Barbara had her gun. She said she was asleep in her bedroom at the time of the incident in question.

Don Warfield said that Barbara wanted to know what her lantern was doing hanging out in the tree, and Smithwick said, "well, I'll get your d___d old lantern." He said that Barbara said she was going to take her ice chest too and that she turned it over and scattered beer all over the place. He related that when Smithwick returned with the lantern, he said "well I'll be d___d" or something like that. He said that Smithwick said, "here's your d___d old lantern," and then "went like that," apparently indicating to the jury the motion made by Smithwick. He subsequently testified that he did not actually see Smithwick swing the lantern. He also testified that he had earlier seen Barbara with a gun which she was showing to others until her husband came in and told her to put it away.

James Jerry Smithwick, testifying in his own behalf, testified that when he brought Barbara her lantern, she said "I'm going to blow your s___t away." He said that he thought she was going to shoot him because she had been carrying a pistol ever since he had known her. He testified that he turned and intentionally swung the lantern. He related that he swung the lantern only once, intending to knock the gun out of the way. He acknowledged that he never personally saw Barbara's gun that night. He denied hitting Barbara twice. He said that he did not know if in later conversation he talked about a gun or about nearly getting shot.

There was no testimony that Barbara actually had a gun out at the time of the incident.

We find that a rational jury could have found that Smithwick failed to prove his defense by a preponderance of the evidence. There is no evidence that Barbara had any weapon at the time of the incident. Barbara testified that Smithwick hit her a second time after she was down on the ground, which, if true, is inconsistent with Smithwick's self-defense contention. Additionally, Smithwick's friends with whom he spent the night after the incident recalled that he did not mention anything about a gun. We overrule points of error numbers five and six.

The judgment is affirmed.