REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2571

September Term, 2014

_____

WAYNE BYRON WARREN, JR.

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Leahy,
Moylan, Charles E., Jr.
    (Retired, Specially Assigned),

                              JJ.

_____

Opinion by Moylan, J.

_____

Filed:  January 29, 2016

The subject is double jeopardy, sometimes referred to as "res judicata in prison gray." The appellant, Wayne Byron Warren, Jr., was convicted in the Circuit Court for Caroline County in a non-jury trial of four separate counts, each charging Sexual Abuse of a Minor. On this appeal, the appellant contends that three of the charges against him – Counts 1, 2, and 3 – should have been completely barred by his protection against double jeopardy, and that most of the remaining charge, Count 4, was similarly barred by the Double Jeopardy Clause of the Fifth Amendment. The case presents us with a challenging array of finely nuanced double jeopardy problems.

## General Background

The appellant married his wife, K., in July of 2008 and they moved to a home in Greensboro in Caroline County. Also as part of the family unit were K.'s four daughters by earlier relationships: C., who was at that time going into the fifth grade; J., who was going into the third grade; F., who was starting the first grade; and E., who was four years old. It was J., the second oldest of the appellant's step-daughters, who became the victim of his sexual predations over the course of the next five years. J. was eight years of age when the course of abusive conduct began and 13 years old when it was brought to an abrupt halt.

In January of 2013, C., who was two years older than J., realized that she was being approached by the appellant for illicit sexual activities and effectively blew the whistle on the appellant and his behavior. C. left home, later explaining:

> "I knew that he knew that I didn't do it, um, and that was my last straw. I was tired of, I was tired of the training, I was tired of how I was treated at home. I was tired of him being a jerk. I was tired of my mom falling for everything. So I packed up a bag and left."

C. stayed at a friend's house for the weekend, during which she contacted the police to inform them about nude photographs that the appellant had taken of her and her sisters. It was at that point that the Caroline County Department of Social Services ("DSS") began an investigation of the family. Initially, J. did not tell DSS about anything other than the nude photographing because she was afraid that "something bad was going to happen."

In May of 2013, however, J. did reveal to DSS that on several occasions she woke up to find the appellant in bed with her and touching her genital area. The appellant's step-daughters were removed from the family home in June of 2013 and went to live with their aunt and uncle. A week after that removal from the home, J. revealed to her mother that on three occasions she had been forced to perform fellatio on the appellant. DSS was in turn informed by the mother.

### The First Prosecution

Trooper First Class Nathaniel Van Sant of the Maryland State Police became involved in the case against the appellant in June of 2013. On September 6, 2013, the appellant was arrested and gave an audio-tape statement to Trooper Van Sant, implicating himself in a wide variety of questionable and suggestive activities with J. and with several of her sisters. He admitted taking a series of naked photographs but explained that they had been taken for the purpose of monitoring weight loss. He admitted to subjecting at least two of his stepdaughters, including J., to naked ice baths but explained that they were part of a martial arts training program. He denied, however, forcing J. to perform fellatio.

On October 28, 2013, the State filed an eight-count criminal information against the appellant. Following a jury trial on April 21-22, 2014, the appellant was convicted on two of the eight charges:  Sexual Abuse of a Minor and a sexual offense in the second degree. He was sentenced to seven and one-half years of imprisonment on each count, the sentences to run consecutively for a total sentence of fifteen years. He was also ordered to register as a Tier III sex offender.

The appellant appealed those convictions to this Court. In an unpublished 24-page opinion, this Court affirmed the convictions. Warren v. State, No. 1482, September Term, 2014 (filed on October 23, 2015). The three contentions dealt with in that opinion have little pertinence to the double jeopardy issue now before us.

### Last-Minute Evidence and a New Beginning

As that first case was being presented to the jury, the State understandably could have had some qualms about the strength of its evidence. Although there was some modest corroboration, the State's case essentially rested on the credibility and the persuasiveness of a 13-year-old girl, a 13-year-old girl whose memory as to some events was being called upon to reach back five years. As to each of the eight counts, the State had no precise dates and was left to allege that the actions with which the appellant was charged had occurred at some unspecified time "between July 1, 2008 and December 31, 2012." That was a four and one-half year stretch. Understandably, the State could not have felt that it was holding a pat hand.

It was, therefore, as if the cavalry were charging to the rescue when a Homeland Security investigator informed the prosecutor on the first day of trial that Homeland Security investigators had been able to retrieve irrefutable photographic evidence establishing four acts of sexual abuse by the appellant and pinpointing a precise date for each such act. When the appellant and his wife had moved in with the appellant's father in February of 2014, they had filled a storage pod which was picked up by a private company and taken to its warehouse in Delaware. On February 7, the wife met Trooper Van Sant at the storage facility and gave him permission to conduct a search of the contents.

Four thumb drives, six micro discs, one adapter, six hard drives, a tower and a disc labeled "Photos 1" were seized. Trooper Van Sant took the electronic storage materials to Homeland Security investigators to see what, if anything, could be retrieved. All of the images that were ultimately retrieved had earlier been ostensibly deleted, but the computer had stubbornly stored the deleted images in "unallocated clusters." It was in the early afternoon of the first day of two trial days that the State received either copies of the relevant images or information describing them. Three of the four sets of images squarely corroborated incidents of alleged abuse testified to by J. Through technological wizardry, a shaky case had ripened into what could have been an ironclad winner.

The trial court ruled, however, that the State would not be permitted to use any of the images retrieved by Homeland Security because neither the appellant nor defense counsel

had seen the images in time to prepare to defend against them. In the jury verdict of the next day, the State nonetheless prevailed.

## The Second Prosecution

The subsequent thinking of the State is relatively simple to follow. Since that first-class evidence produced by Homeland Security had not been used against the appellant at his first trial, then, lest it be wasted, why not make it the basis for an additional trial? Double jeopardy might not have seemed to be a problem because the new evidence had never been used against the appellant. It had never before placed him in jeopardy.

On July 18, 2014, a new indictment against the appellant was handed down. The new indictment was drawn in four counts. Each count was designed to embrace one of the actions depicted by the photographic images (or sets of closely related images) retrieved by the Homeland Security experts from the discarded entrails of the appellant's computer. Each of the four counts charged precisely the same crime – Sexual Abuse of a Minor. The appellant moved, unsuccessfully, to dismiss the new indictment on the basis of double jeopardy.

In terms of its timing, the new indictment was presented just three months after the guilty verdicts had been rendered at the first trial and one month before the appellant was sentenced, on August 20, 2014, to 15 years' imprisonment on his two convictions.

After a non-jury trial, on January 13-14, 2015, the appellant was convicted on all four counts of the new indictment. On February 2, 2015, he was sentenced to a total of 55 years imprisonment with all but 20 years suspended. The sentences were to run consecutively to

each other and to any sentences already being served. This appeal followed on double jeopardy grounds.

## Measuring Jeopardy

Our immediate problem, of course, is to decide how much, if any, of the jeopardy in which the appellant was placed at his second trial of January 13-14, 2015, should have been barred by the earlier jeopardy in which he stood in the course of his first trial on April 21-22, 2014. Involved are at least two very fundamental and critical questions: 1) When precisely does jeopardy attach? and 2) What is the scope of the jeopardy that then attaches?

## When Does Jeopardy Attach?

"...; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb;..."

U.S. Const. amend. V.

Double jeopardy, as a plea in bar and not a defense on the merits, has a history rooted deep in English common law. As this Court explained in Copsey v. State, 67 Md. App. 223, 225, 507 A.2d 186 (1986):

"'Double jeopardy' was a convenient umbrella term adopted by Sir William Blackstone to cover, along with several other closely related pleas no longer pertinent, the two common law pleas in bar of autrefois acquit (former acquittal) and autrefois convict (former conviction). These were not and are not general issue pleas for purposes of defending upon the merits. They were and are pleas in bar, intended to be interposed in advance of a contemplated subsequent trial for the purpose of foreclosing that trial."

(Emphasis supplied).

-6-

The plea in bar of double jeopardy embraces, inter alia, both the plea of former acquittal and the plea of former conviction. The Copsey opinion, 67 Md. App. at 225-26, further pointed out:

> "The purpose served by the plea of former acquittal is that of preventing a defendant who has once survived his initial jeopardy from being 'twice vexed' by a fresh exposure to the hazard of conviction for that same offense. The purpose served by the plea of former conviction is that of preventing a defendant who has once been convicted of an offense from being exposed to the hazard of being twice punished for that same offense."[1]

(Emphasis supplied).

The federal constitutional law of double jeopardy and the Maryland law of double jeopardy are now one and the same. It was not always so. Gilbert and Moylan, Maryland Criminal Law, §37.1, "State Double Jeopardy or Federal Double Jeopardy," p. 432, explains:

> "The Fifth Amendment provision against double jeopardy, originally applicable only to the Federal Government, was enacted as part of the original Bill of Rights in 1791. Quite independent of the federal protection, 45 of the American states have also included double jeopardy protections in their own Bills or Declarations of Rights. Five of them,[2] including Maryland, have not. Each of these five has, however, included the protection against double jeopardy as part of its own common law."

(Footnote in original).

---

[1] As will be more fully developed infra, it would appear that the appellant here was not simply "twice punished for [the] same offense" but was actually punished five times for the same offense; once at the first trial for his single conviction of Sexual Child Abuse and four additional times at the second trial with separate sentences for each of his four convictions for Sexual Child Abuse.

[2] The other four are Massachusetts, Connecticut, Vermont, and North Carolina.

-7-

In 1969, however, <u>Benton v. Maryland</u>, 395 U.S. 784, 89 S.Ct. 2056, 23 L. Ed. 2d 707 (1969), held for the first time that the Fifth Amendment protection against double jeopardy was incorporated into the Due Process Clause of the Fourteenth Amendment and was, therefore, binding on the states.

In applying the two ancient pleas in bar of <u>autrefois</u> <u>acquit</u> and <u>autrefois</u> <u>convict</u>, the former jeopardy was deemed to attach at common law only when the trial verdict, of conviction or acquittal, was actually rendered. Maryland continued to follow that common law logic until we were embraced by the federal Fifth Amendment in 1969. The constitutional law of double jeopardy had grown, in contrast to the common law and to earlier Maryland law, into an umbrella concept that embraced such related protections as mistrial/retrial law and collateral estoppel.[3]

---

[3]Basically, the federal law of double jeopardy and the common law of double jeopardy are not that far apart. The federal law embraced the common law, as both proceeded from the early pleas in bar of <u>autrefois</u> <u>acquit</u> and <u>autrefois</u> <u>convict</u>. Although both the federal and the common laws of double jeopardy theretofore had developed along essentially indistinguishable and parallel courses, a major change occurred with the Supreme Court decision of <u>Wade v. Hunter</u>, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

Over the centuries, both the common law generally (including Maryland) and federal procedural law had, via caselaw, developed a number of protections to guard against a prosecutor or a trial judge's promiscuous declaration of a mistrial when the mistrial worked to the distinct advantage of the defendant. None of this protection, however, valuable as it might be, was ever thought of by anyone as being a part of double jeopardy law. On several occasions on the federal side, however, the prohibition on a retrial was casually and heedlessly referred to as an aspect of double jeopardy law. In his dissenting opinion in <u>Crist v. Bretz</u>, 437 U.S. 28, 34, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978), Justice Lewis Powell characterized this lax usage as "the product of historical accident." Accident or not, it

(continued...)

As Justice Stewart explained in <u>Crist v. Bretz</u>, 437 U.S. 28, 33-38, 98 S.Ct. 2156, 57 L. Ed. 2d 24 (1978), the inclusion of those other protections and the full implementation, therefore, of the now broader conceptualization of double jeopardy required that the attachment of jeopardy be moved forward from the end of the trial when a verdict is rendered to the very beginning of the trial. Under the prevailing federal interpretation of the double jeopardy protection, indisputably now binding on Maryland, jeopardy attaches in a jury trial at the moment the jury is sworn.[4] As the Supreme Court held, 437 U.S. at 38:

> "The federal rule that <u>jeopardy attaches when the jury is empaneled and sworn</u> is an integral part of the constitutional guarantee against double jeopardy."

The appellant's first trial was a jury trial. The jeopardy that will have a preclusive effect in this case, therefore, attached as of the moment the jury was sworn on the morning of April 21, 2014. We will measure the jeopardy in which the appellant stood as of that moment and not as of some later time, such as when opening statements were made or when two of the eight counts against him were nol prossed or when the jury was instructed or when the case was submitted to the jury or when the verdicts were rendered. The appellant

---

[3](...continued)
became firmly locked into the constitutional law of double jeopardy with <u>Wade v. Hunter</u> in 1949. It was with this 1949 expansion of double jeopardy law to include, as now part of it, mistrial/retrial law that it became necessary to move the attachment of jeopardy from the rendition of the verdict back to the very beginning of the trial. Until 1949, in federal double jeopardy law, just as in the rest of the common law world, jeopardy did not attach until the rendering of the verdict.

[4] In an non-jury trial, jeopardy attaches when the first witness is sworn. <u>Serfass v. United States</u>, 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L. Ed. 2d 265 (1975).

was at risk from the opening gun, and that early risk is dispositive even if some of the jeopardy was later removed or alleviated.

## How Do We Measure the Scope of Jeopardy?

As the appellant was, with the swearing of the jury, enveloped in a cloud of jeopardy, how do we measure the scope of that jeopardy? How do we chart the metes and bounds of that cloud? The answer in a nutshell is that our measuring is a function of the pleading. The scope of jeopardy is not measured by the evidence offered in the trial or by the arguments made or by the instructions given. It is measured by the words of the indictment or criminal information.

In <u>Anderson v. State</u>, 385 Md. 123, 140, 867 A.2d 1040 (2005), Judge Wilner wrote for the Court of Appeals:

> "In determining the scope of the former conviction, <u>the court must ordinarily look at the effective charging document upon which judgment was entered, not just the evidence presented in support of that charge</u>. We have often made clear that <u>the primary purpose of a charging document is to inform the defendant of the accusation against him</u>/her by so describing the crime 'as to inform the accused of the specific conduct with which he is charged,' <u>in order, among other things, to 'protect[ ] the accused from a future prosecution for the same offense</u>."

(Emphasis supplied; citations omitted). The Court of Appeals went on:

> "The Supreme Court, for Constitutional purposes, and <u>we</u>, as a matter of common law, <u>have rejected an 'actual evidence' test to determine sameness</u> in law, and we see no profit, absent special circumstances not present here, in adopting that test to determine sameness in fact. In most cases, <u>the only sensible and workable criterion for determining the nature and scope of the prior offense is the effective charging document</u>. <u>That states the offense for which the defendant was tried</u>."

-10-

Id. at 141. (Emphasis supplied).

This Court followed suit in Ingram v. State, 179 Md. App. 485, 492, 947 A.2d 74 (2008):

> "As the Court of Appeals explained in Anderson, 385 Md. at 140-41, 867 A.2d 1040, the question of whether offenses are separate for double jeopardy purposes is generally determined by reviewing the charging documents rather than the actual trial evidence."

(Emphasis supplied).

In Williams v. State, 302 Md. 787, 790-91, 490 A.2d 1277 (1985), Chief Judge Robert C. Murphy explained the importance of the charging document as a protection against double jeopardy:

> "A primary purpose of a charging document is to fulfill the constitutional requirement contained in Article 21 of the Maryland Declaration of Rights that each person charged with a crime must be informed of the accusation against him. More particularly, the purposes served by the constitutional requirement include (1) putting the accused on notice of what he is called upon to defend by characterizing and describing the crime and conduct; (2) protecting the accused from a future prosecution for the same offense[.]"

(Emphasis supplied; internal citations and footnote omitted). See also Jones v. State, 303 Md. 323, 336-37, 493 A.2d 1062 (1985); State v. Morton, 295 Md. 487, 490, 456 A.2d 909 (1983).

A bill of particulars, to be sure, might limit the thrust of a charging document and thereby limit the jeopardy emanating from that charging document, but that is a limitation that would normally occur pretrial, before jeopardy first attaches. In this case, moreover,

there was no bill of particulars. The appellant had, indeed, filed a motion for a bill of particulars but it was "filed way late." At the motion hearing on April 17, 2014, Judge Karen Murphy Jensen denied the request for particulars:

> "I've got the Motion for the Bill of Particulars and it's filed way late. So the Bill of Particulars is going to be denied."

(Emphasis supplied).

It is also clear that the request for particulars was simply a request for information and had nothing to do with limiting the thrust or scope of the charges against the appellant.

> "THE COURT: But I'm assuming and hoping that you got all the information you need anyway.
>
> "[DEFENSE COUNSEL]: Yes, Your Honor."

Indeed, because jeopardy attaches before any evidence is offered and before any argument is made, how could one possibly measure the scope of the jeopardy other than by examining the pleadings? It behooves all parties who must deal with double jeopardy to remember that double jeopardy is not a trial defense. The scope of jeopardy does not ebb and flow as various events transpire in the course of the trial. Double jeopardy is a plea in bar. It is asserted and decided before a trial even begins. If successful, it prevents a trial from ever taking place.

In determining the scope of the initial jeopardy, therefore, our first mission is to examine the criminal information that went to trial on April 21, 2014, and to see how

-12-

sweeping an enfilade of jeopardy it laid down. Was that enfilade broad enough to cover the four new charges brought by the indictment that went to trial on January 13, 2015?

## The Earlier Cloud of Jeopardy

The source of initial jeopardy in this case was the eight-count criminal information that the State took to trial on April 21, 2014. The question is that of how much of the jeopardy later generated by the four-count indictment that went to trial on January 13, 2015, simply replicated the earlier jeopardy of nine months before.

Three of the eight counts of the earlier criminal information – Counts 3, 5, and 7 – expressly charged a Second-Degree Sexual Offense in contravention of Md. Code (2002, 2012 Repl. Vol), Criminal Law Article, §3-605. The first count charged a violation of §3-315, a continuing course of conduct involving three or more violations of either the Rape or the Sexual Offense statutes. Strangely, no less than four of the eight counts – Counts 2, 4, 6, and 8 – charged Sexual Abuse of a Minor in contravention of §3-602. Each of these four counts was a verbatim clone of the others, charging exactly the same conduct and covering exactly the same four and one-half year time period.

What the charging authorities thought that they were doing is a mystery. The Caroline County Grand Jury indicted with promiscuous abandon. Charging the same offense four times was a case of multiplicious charging per se, but that issue is fortunately not before us.[5]

_____

[5]With respect to both multiplicious pleading and duplicative pleading, see Albrecht v. State, 105 Md. App. 45, 55-57, 658 A.2d 1122 (1995). See also Robinson v. State, 353

(continued...)

It seems that the criminal information was trying to pair-up each of its Second-Degree Sexual Offense charges with a broader umbrella charge of its own. One umbrella charge, however, could embrace all three of the Second-Degree Sexual Offense charges – and much more besides. Even if all three of the paired sets of charges had produced verdicts of guilty, guilt for a Second-Degree Sexual Offense could readily be multiplied by three, yielding a maximum penalty of 60 years instead of 20 years. The Sexual Abuse of a Minor charge, on the other hand, could not be multiplied by four. It would have been an improper multiplication of guilt for Sexual Child Abuse that would presume to increase the maximum penalty of 25 years for such an offense into an illegal sentence of 100 years. In taking the single indivisible crime of Sexual Child Abuse and fragmenting it into four distinct offenses, the State was attempting to divide the indivisible.

Those eight counts generated a pervasive cloud of jeopardy, even if three of those eight counts were aimlessly redundant. It is hard to imagine anything that the appellant could have done vis-à-vis J. prior to January 2, 2013, that might not have placed him in jeopardy again with respect to at least one of the four newer counts charging Sexual Child Abuse. The fact that Count 1 and Count 8 of the original criminal information were ultimately nol prossed is not pertinent, of course, because they had already generated their full measure of jeopardy before the nol prossing occurred. The chronology of the nol prossing was clear.

---

[5](...continued)
Md. 683, 688 n.4, 728 A.2d 698 (1999); Brown v. State, 311 Md. 426, 432 n.5, 535 A.2d 485 (1988).

-14-

After the second alternate juror was selected and seated, Judge Jensen proceeded to have the jury sworn.

> "THE COURT: Okay. <u>So the minute I swear them in, then jeopardy attaches</u>, so Counsel want to go ahead and swear them in?
>
> "[DEFENSE COUNSEL]: Yes.
>
> "THE COURT: Yep. [The State]? Ready?
>
> > "(No audible response)
>
> "THE COURT: Okay.
>
> "[COURT CLERK]: Ladies and gentlemen seated in the jury box, would you please stand and raise your right hand.
>
> > "(<u>Jury sworn</u>)
>
> "THE COURT: Okay. Have a seat. Thank you. Well, the rest of you are free to go."

(Emphasis supplied).

It was several minutes thereafter, after the jury foreperson had been selected and reseated in the appropriate chair, that attention turned to the nol prossing of Counts 1 and 8.

> "THE COURT: All right, [ ] <u>can we go ahead and take care right now of *nolle prosing*</u>, <u>you said</u>, did you want to, <u>you were going to *nolle prose* counts</u> ...
>
> "[THE STATE]: <u>Counts 1 and Count 8</u>.
>
> "THE COURT: Count 1, so that would be the Sex Abuse of Minor, continuing course of conduct. And Eight is Sex Abuse, one count of Sex Abuse of a Minor. <u>So those two are *nolle prosed*</u>."

-15-

(Emphasis supplied).

The fact that of the six remaining counts, four produced not-guilty verdicts is equally of no moment, because the plea in bar of <u>autrefois</u> <u>acquit</u> was, and is, just as foreclosing of future jeopardy for the same offense as is the plea in bar of <u>autrefois</u> <u>convict</u>. Double jeopardy is not concerned with what happened to a defendant at his first trial. Its concern is with whether the defendant had been placed in jeopardy and, if so, jeopardy of what.

In the new indictment, all four counts expressly charged Sexual Abuse of a Minor in contravention of §3-602(b)(i). The earlier charges, creating the initial jeopardy, had covered the time period of July 1, 2008, through December 31, 2012. Two of the new counts alleged precise dates – December 6, 2009, and February 15, 2010 – both of which fell squarely within the earlier four and one-half year range of jeopardy. The third of the new counts charged conduct allegedly occurring within the one year period between January 1, 2012, through December 31, 2012, all of which fell within the earlier period of jeopardy. Looking to the first three of the four counts of the new indictment, anything within the operational lifetime of the first three of these counts that could have helped to convict the appellant of Sexual Child Abuse under the new indictment could self-evidently have helped to convict him under the original criminal information. He had obviously been in jeopardy back then for anything he had done back then. He should not have been placed in jeopardy a second time for that same conduct.

**There Is No Such Thing as a Little Jeopardy**

The fourth and final new count covered the period of October 1, 2012, through January 30, 2013. Three months of that four month period overlapped the earlier period of jeopardy. Only the last 30 days did not.

With respect to these last 30 days, the appellant may find the reassuring words of the State less than fully comforting. The State would suggest that the charge is not barred by the double jeopardy protection because the appellant would only be in forbidden jeopardy for 90 of the charge's 120 days. The reassurance seems to be that there is only a 75% chance that the appellant will be damaged by the forbidden evidence and there is, therefore, a 25% chance that the new charge would not offend the double jeopardy protection.

We do not, however, calibrate so finely the risk of double jeopardy. The new charge should have been barred if it placed the appellant in any risk of double jeopardy. He was entitled to more by way of protection than the mere in limine relief he sought. The double jeopardy protection is not a trial defense, enabling the appellant to keep certain evidence out even as other evidence comes in. It is, rather, a plea in bar, shielding a defendant from even going to trial on a partially unconstitutional charge in the first instance. Even as to Count 4, the appellant was fully protected, not partially protected.[6] If at a proposed second trial, the

_____

[6]Even with respect to the fourth count of the new indictment, the testimony of J. squarely placed the inculpatory photography session in November of 2012, well within the appellant's constitutionally protected period and not in the excess 30 days.

-17-

charging document would place a defendant in even partial double jeopardy, the second trial itself should be barred on grounds on double jeopardy.[7]

## The Accordion of Sexual Child Abuse

The case does present a more vexing problem than do most. The protean nature of the crime of Sexual Child Abuse makes the jeopardy that emanates from it an unusually fluid thing to measure. In <u>Tribbitt v. State</u>, 403 Md. 638, 649-50, 943 A.2d 1260 (2008), the Court of Appeals explained that the current crime, Criminal Law Article, §3-602, "derived without substantive change" from Art. 27, §35(a)(6)(i) and incorporates that earlier law's broad definition of "sexual abuse."

> "Prior to the recodification of the Criminal Law Article, the prohibition against sexual abuse of a child was found at Maryland Code (1957, 1996 Repl. Vol., 2001 Cum. Supp.), Article 27, §35C(a)(6)(i). <u>Sexual abuse was defined as 'any act that involves sexual molestation or exploitation of a child</u> by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member." ... <u>'Any' act may not be read to be restricted to only acts made criminal elsewhere</u>. The Special Revisor's Note to the 2002 recodification states that the recodification was 'derived without substantive change' from the previous version. Therefore, the proper construction of the statute is that <u>'sexual abuse' still encompasses 'any' act that involves sexual molestation or exploitation of a child</u>."

(Emphasis supplied; internal citation and footnote omitted).

---

[7]Although the precise scenario we are about to suggest is, to be sure, not before us in this case, it would seem that if the earlier criminal information and Count 4 of the new indictment had overlapped not by 90 days but by a single day, the plea in bar of double jeopardy might still have been triggered. The words of the Fifth Amendment strongly suggest that the constitutional shield is against being placed twice in even a little jeopardy and not simply against being placed twice in massive jeopardy.

In the Tribbitt case itself, the Court of Appeals considered, 403 Md. at 643, the question of,

> "'may sexual contact that does not constitute a sexual offense in any degree or otherwise violate any provision of Maryland law nonetheless provide a basis for 'sexual abuse' within the meaning of Section 3-602 of the Criminal Law Article?'"

(Emphasis supplied).

The answer was unequivocally, "yes." The statutory crime of Sexual Child Abuse is not limited to a constituent sexual crime or crimes. It could theoretically embrace dozens of them. At the other end of the shape-shifting spectrum, Sexual Child Abuse does not require the commission of a statutorily cognizable sexual offense in any degree. There may be the requisite "sexual molestation or exploitation of a minor" without any criminal act per se. §3-602(a)(4)(i). See also, Crispino v. State, 417 Md. 31, 44, 7 A.3d 1092 (2010) ("Section 3-602, the current iteration of the child abuse statute, derived without substantive change from Section 35C.").

Although Cooksey v. State, 359 Md. 1, 23-24, 752 A.2d 606 (2000), was dealing with the predecessor crime of Art. 27, §35C, what it said about the essential fluidity of the crime would apply with equal certainty to §3-602.

> "[T]he gravamen of the offense is not the sexual act itself, which is punishable in its own right under other statutes, but rather the abuse of the child. That abuse can as easily arise from several qualifying acts as from one. As we pointed out in Nightingale v. State, 312 Md. [699] at 708, 542 A.2d [373 (1988)], a charge of sexual child abuse may be sustained on evidence that would not support a conviction under the sexual offense, rape, sodomy, or perverted practice laws. ... "A jury could certainly find a single incident of

-19-

> some of that conduct to constitute abuse under §35C, but it might well require <u>more than one incident</u> of other conduct in order to find the requisite 'sexual molestation or exploitation.' <u>Abuse</u>, as defined by §35C <u>is thus a crime that can be committed both by a single act and through a continuing course of conduct consisting of multiple acts</u>."

(Emphasis supplied; footnote omitted).

In further elucidating the inherent fluidity of Sexual Child Abuse, <u>Crispino v. State</u>, <u>supra</u>, points out that French kissing, although not amounting to either a second-degree or a third-degree sexual offense <u>per se</u>, could nonetheless support a conviction for Sexual Child Abuse. 417 Md. at 44-55. The <u>Crispino</u> opinion also held that where there is more than one contributing act possibly supporting guilt of Sexual Child Abuse, jury unanimity is not required with respect to any one of the constituent acts. <u>Id.</u> at 49.

In terms of how to compute units of jeopardy, <u>Malee v. State</u>, 147 Md. App. 320, 809 A.2d 1 (2002), also provides guidance. Over the course of a six-month period, Malee was guilty of repeated sexual offenses against the seven-year-old son and the three-year-old son of his live-in girlfriend. He ended up being convicted of 20 separate counts charging him with six different forms of second-degree sexual offense. He was also convicted of 10 separate counts charging him with four different varieties of third-degree sexual offense. As embracive of all 30 distinct counts of second-degree and third-degree sexual offense, however, Malee was convicted of a single and indivisible umbrella crime of continuing Sexual Child Abuse. It embraced all 30 of its constituent parts. In <u>State v. Mulkey</u>, 316 Md.

475, 560 A.2d 24 (1989), the defendant there was convicted of 12 separate counts charging a third-degree sexual offense but only of a single count of continuing child abuse.

In analyzing double jeopardy scenarios, an umbrella crime such as Sexual Child Abuse, pursuant to §3-602, poses especially perplexing problems, because an umbrella crime may appear in ever changing shapes and sizes. It is an accordion. It may be pressed together so tightly that at times it embraces a single constituent crime. It may actually be compressed even more tightly, embracing only instances of sexually abusive behavior that are not actually criminal. The accordion of Sexual Child Abuse, on the other hand, may at times be opened up so expansively as to embrace dozens, nay hundreds, of constituent criminal acts, charged or uncharged. Even if embracing a hundred constituent criminal acts, however, the umbrella crime of Sexual Child Abuse itself remains a single and indivisible crime. It does not fragment with the multiplication of its supporting evidence.

Although the actual evidence or the supportive theories of Sexual Child Abuse may, like accordions or umbrellas, expand and contract unpredictably, our only concern for purposes of double jeopardy assessment is with the maximum risk or jeopardy. We measure the spectrum of jeopardy at its widest, which is as of the moment it first attaches, before any evidence has been offered or even alluded to in opening statement, before any words have been spoken, before any theories have been propounded. Any possible limitation on the scope of jeopardy would have to appear explicitly in the charging document itself.[8]

---

[8]All four charges of allegedly abusive behavior at the first trial could readily have
(continued...)

## A Part Is Not The Whole

The State's attempt to minimalize the jeopardy that the appellant was exposed to at his first trial by equating three of the umbrella charges of Sexual Child Abuse with the three charges of Sexual Offense in the Second Degree (ultimately of fellatio) will not work. The fact that proof of the Second-Degree Sexual Offense would be sufficient to prove the larger umbrella offense by no means operates to restrict other available proof. The State was in no way prohibited from making a larger and stronger case of Sexual Child Abuse by offering other and additional evidence of guilt.

Because a single act of a Sexual Offense in the Second Degree is legally sufficient to prove the more embracive crime of Sexual Abuse of a Minor does not mean that the State was prohibited from offering more evidence than that and from building an even stronger case. The State is not precluded from going beyond a merely legally sufficient case. By foregoing any attempt to build a stronger case, the State did not thereby reduce the jeopardy emanating from the fact that it could have presented a stronger case. The legal sufficiency of the evidence to prove the broader crime is a floor and not a ceiling.

---

[8](...continued)
been embraced by a single charge of Sexual Child Abuse. If the discrete instances constituting the abusive behaviors are themselves criminal, they may, of course, be multiplied by charging those specific crimes per se. But can a manipulation of the pleading, as the State attempted to do in this case, produce a fourfold multiplication of the umbrella crime, leading to four convictions and a possible 100 years of incarceration instead of one conviction with a 25 year maximum? It would seem not. It would deny the umbrella crime its inherent character as an umbrella crime.

The State's attempt to accomplish the restrictive pairings by looking to the judge's jury instructions for that purpose is also bizarre. The jury instructions came long after full-blown jeopardy was a <u>fait</u> <u>accompli</u>. Double jeopardy's concern is not with what ultimately happens to a defendant but with what could happen to a defendant as the trial begins. The bell of jeopardy, once rung, cannot be unrung.

The State argues that at the first trial, three of the counts charging Sexual Child Abuse were paired with three counts charging a second-degree sexual offense (fellatio) and that a jury instruction in that regard limited the appellant's total jeopardy to three acts of fellatio and that there was, therefore, no other possible jeopardy involved. The pertinent part of the jury instructions was:

> "Now the Defendant is charged with three counts of Second Degree Sexual Offense and three counts of Sexual Abuse of a Minor, ... allegedly occurring on three separate occasions. ... The Defendant is charged with the crime of Child Sexual Abuse. Child Sexual Abuse is sexual molestation or exploitation of a child under eighteen (18) years of age, caused by a member of the household of that child. <u>In order to convict the Defendant of Child Sexual Abuse, the State must prove first that the Defendant sexually abused [J.] by committing fellatio</u>."

(Emphasis supplied).

> From that, the State now argues:

> "Because [appellant] was only placed in jeopardy in Case No. 9963 for the sexual abuse of a minor on conduct related to fellatio, <u>the circuit court properly denied [appellant]'s motion to dismiss the sexual abuse of a minor counts in this case where the alleged abusive conduct was unrelated to fellatio</u>."

(Emphasis supplied).

-23-

For all the reasons we have just discussed, neither a jury instruction nor anything else that occurs in the course of a trial defines jeopardy or limits its maximum content, which is measured as of the moment the jury is sworn. It does not thereafter diminish. Once the appellant is in jeopardy for Sexual Child Abuse of a particular child within a particular period of time, the State may not subsequently limit that jeopardy by deciding that the appellant is only in jeopardy for the constituent forms of child abuse that it decides to present and is not in jeopardy from other constituent acts of abuse which it could have presented but chose not to. When the Pandora's box of jeopardy is opened at the outset of the trial, the incriminating contagion all comes out.

Even the State's attempt to restrict the jeopardy of the broader crime by pairing it with a narrower crime, moreover, could not account for or even arguably restrict the fourth of the counts charging Sexual Child Abuse, Count 8. The State did not attempt to pair off that count with any specific charge of Sexual Child Abuse. Why it was even there, we cannot imagine – but it was there, with a widely diffused cloud of jeopardy hovering above it.

## Overlapping Jeopardies

The overlapping of jeopardies in this case was more than theoretical. Count 2 of the indictment at the second trial charged Sexual Child Abuse. The appellant's brief describes the testimony and physical evidence offered to support the conviction on that count.

"The evidence regarding Count 2 consisted of [J.]'s testimony that as part of a martial arts training program that [the appellant] was leading for her ... when she was nine to ten years old, she had to take ice baths. [J.] wore a sports bra and underwear in the ice baths. There were times when she was not wearing anything; she was 'completely naked.' The State introduced a video clip of [J.] in an ice bath. [J.] is naked in the video. [The appellant] is also depicted in the video and is naked. [The appellant] testified that typically [J.] wore a sports bra and underwear in the ice bath but that she and he were naked in that particular video because [J.] had an irrational fear of undressing at doctors' appointments and he was trying to show her that it was okay to be undressed in front of certain people. The date stamped on the video was February 15, 2010. [J.] identified herself in the video and testified that she appeared to be about 10 years old."

(Emphasis supplied; record citations omitted).

That was a description of the second trial. The opinion of this Court filed on October 23, 2015, affirming the convictions in the first trial, described evidence that in that case had constituted the first jeopardy:

"J. testified that when she was nine-years-old, she became interested in taking karate – or, as she called it, 'fighting classes' – and asked appellant if he could get her into a class. Instead of signing her up for a class, appellant began to train J. and W. at home on Sundays, while the rest of the family went to church. At first, he taught them how to kick and punch, and she was given a black 'gi,' which she described as a 'ninja costume,' to wear during training. After a couple of months, the physical training was replaced by 'ice baths' and 'weird stuff.'

"J. explained that the bathtub would be filled with up to six big bags of ice, and appellant would make her get in and meditate for 25 to 30 minutes at a time. Appellant would remain in the room with her. She usually wore a sports bra and underwear, but on one occasion, appellant made her take the ice bath while naked. She did not understand what the point of the ice bath was, but stated that appellant would scold her if she shivered, and would tell her to stop. On one occasion, appellant stripped down to his underwear and got into the bathtub with her."

-25-

(Emphasis added).

Self-evidently, the appellant was convicted again on January 14, 2015, of Sexual Child Abuse based on the same evidence upon which he had earlier been convicted of Sexual Child Abuse on April 22, 2014, and for which he was then serving seven and one-half years of a 15-year sentence.

The evidence supporting Count 3 of the new indictment, also charging the Sexual Abuse of a Minor, is summarized in the appellant's brief.

> "Count 3 was based on [J.]'s testimony that [the appellant] took pictures of moles on her neck, chin and 'crotch area.' [J.] identified a photograph of the mole on her 'crotch' and testified that [the appellant]'s finger was in the photo. [The appellant] told [J.] that the photos of the moles were taken to watch the moles for any changes that might indicate skin cancer. [The appellant's wife] testified that members of her family had been diagnosed with malignant melanoma. [J.] was not able to state when the photos were taken beyond testifying that the photographing happened 'years later' than the martial arts training."

(Emphasis supplied; record citations omitted).

Judge Meredith's opinion for this Court described the same evidence at the first trial.

> "He also took photographs of moles on their skin – including one that J. had on her vagina – purportedly to monitor changes in their appearance."

(Emphasis supplied).

The evidence supporting Count 4 at the second trial was summarized in the appellant's brief.

> "The evidence regarding Count 4 included State's Exhibit Number 1, four black and white scanned photographs. Each photo depicts [J.] naked – one each from the front, back, left and right. [J.] testified that she was 12 years

-26-

old when the photos were taken. They were taken in November, 2012. [The appellant's wife] testified that <u>photos were taken of all three girls as part of a weight loss program for the girls</u> and for herself. <u>[The appellant] testified that the point of the photos was to show the girls what they really looked like</u>. [The wife] testified that her other two daughters, not [J.], 'were classified as being obese in school.'"

(Emphasis supplied; record citations omitted).

The opinion of this Court of October 23, 2015, described how that same evidence had been used to support the conviction for Sexual Child Abuse at the first trial.

"In November 2012, appellant explained to J. that, because he had lost his job, they could not afford to go to the doctor. <u>So C., J., and F. had to go into his room, one at a time</u>, where he measured their body fat with calipers while they were clothed only in a hospital gown. <u>He then directed them to take off the gown, and took pictures of them with his cell phone</u>, explaining that the photographs would show whether they had lost any weight."[9]

(Emphasis supplied).

This was no mere double jeopardy; this was the poster child for double jeopardy. At the second trial, the State could simply have offered a transcript of the first trial, which, in effect, it did.

### The State as a Hostile Witness

Ironically, the appellant could have offered the prosecuting attorney as a hostile witness to prove that he was twice put in jeopardy. All four of the counts charging Sexual Child Abuse at the second trial were based entirely on the photographic images that the

---

[9]<u>Brackins v. State</u>, 84 Md. App. 157, 161-62, 578 A.2d 300 (1990), held that photographing a child in the nude could be legally sufficient to establish that the defendant "'exploited' the child when he partially disrobed her for his own pleasure or amusement or gratification or interest."

investigators from Homeland Security had been able to retrieve from the disassembled parts of the appellant's computer. All of the photographic images were of events that had transpired prior to April 21, 2014, when the investigators reported their results to the prosecutors who were then at the trial table. The photographic images were incriminating. They proved to be so at the second trial. They obviously could have been equally incriminating at the first trial, had they been received in evidence. It was for that very reason that they were offered in evidence by the State at the first trial. The State believed that they were relevant, as, indeed, they were. The appellant never questioned their relevance. The trial judge never questioned their relevance. The only reason they were not admitted into evidence was that they had not been received in time to permit the defense to defend against them.

The State obviously believed the evidence from Homeland Security was incriminating and that was its only reason for offering it. The ruling on admissibility could easily have gone in either direction. If the State had felt an urgent enough need for the additional evidence, it could readily have agreed to a brief trial continuance to allow the defense preparation time. The appellant was obviously in jeopardy of that evidence being used against him at his first trial. The ruling on admissibility could very well have gone the State's way.

## Conclusion

Even if the retrieved images had never been discovered, the appellant would nonetheless have been in jeopardy that they might have been discovered. The events depicted by the retrieved images were part of the extant atmosphere at the time of the first trial. It was the historic behavior of the appellant himself for which the appellant was in jeopardy. The modality of the proof of that historic behavior is incidental. The subsequent use of this behavior against the appellant at the second trial obviously placed him twice in jeopardy. The second trial itself in its entirety should have been constitutionally barred.

We repeat. Double jeopardy is not a trial defense. Double jeopardy is a plea in bar, and that fact is the indispensable key to understanding it.

**JUDGMENT REVERSED; COSTS TO BE PAID BY CAROLINE COUNTY.**